**Michael BOWERS, Plaintiff,**

v.

**NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, ACT, Inc., NCAA Initial Eligibility Clearinghouse, Temple University of the Commonwealth System of Higher Education, University of Iowa, American International College, Defendants.**

**No. CIV. A. 97–2600.**

United States District Court,
D. New Jersey.

Aug. 6, 2001.

Barbara E. Ransom, Max Lapertosa, Public Interest Law Center of Philadelphia, Philadelphia, PA, Richard L. Bazelon, Bazelon, Less & Feldman, P.C., Marlton, NJ, for Plaintiff, Michael Bowers.

Charles J. Vinicombe, J. Freedley Hunsicker, Jr., John Schultz, Julianne Peck, Amy E. Pizzutillo, Drinker, Biddle & Shanley LLP, Princeton, NJ, for Defendant, National Collegiate Athletic Association.

Robert A. Burgoyne, Fulbright & Jaworski LLP, Washington, DC, Nicholas M. Kouletsis, Pepper Hamilton, LLP, Cherry Hill, NJ, for Defendants, ACT, Inc. and NCAA Initial Eligibility Clearinghouse.

Mark Schantz, Andrew Ives, Office of the General Counsel, University of Iowa, Iowa City, IA, Thomas J. Miller, Attorney General, Gordon E. Allen, Deputy Attorney General, Office of the Iowa Attorney General, Des Moines, IA, William O. Perkins, Jr., Jersey City, NJ, Jack Jay Wind, Margulies, Wind, Herrington & Knopf, P.C., Jersey City, NJ, for Defendant, University of Iowa.

John B. Langel, Abigail L. Flitter, Ballard Spahr Andrews & Ingersoll, LLP, Philadelphia, PA, for Defendant, Temple University of the Commonwealth System of Higher Education.

James H. Savage, Ruprecht, Hart & Weeks, LLP, Millburn, NJ, for Defendant, American International College.

John J. Farmer, Jr., Attorney General of New Jersey, Jeffrey C. Burstein, Senior Deputy Attorney General, The State of New Jersey, Newark, NJ, for Intervenor, The State of New Jersey.

John James Peirano, Jr., Carpenter, Bennett & Morrissey, Newark, NJ, for Third–Party Defendant, University of Massachusetts Amherst.

Peter L. Frattarelli, Archer & Greiner, A Professional Corporation, Haddonfield, NJ, for Third–Party Defendant, University of Memphis.

Michael K. Willison, Dickie, McCamey & Chilcote, Lawrenceville, NJ, for Third–Party Defendant, Delaware State University.

## OPINION

ORLOFSKY, District Judge

Once again, this protracted and hotly contested case alleging disability discrimi-

nation requires this Court to analyze and resolve a novel issue of law. This novel issue involves the interplay between the United States Constitution and state law prohibiting discrimination on the basis of disability. This Court must now address whether the Plaintiff, Michael Bowers ("Bowers"), may maintain his claims under the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. § 10:5–1, against Defendants, National Collegiate Athletic Association ("NCAA"), ACT, Inc. and the Initial Eligibility Clearinghouse ("ACT/Clearinghouse"), the University of Iowa ("Iowa"), Temple University of the Commonwealth System of Higher Education ("Temple") and American International College ("AIC"). The Defendants argue, among other things, that to apply the NJLAD to them in this case would violate the Due Process and Dormant Commerce Clauses of the United States Constitution because the NJLAD can not apply to places of public accommodation not located within New Jersey, even if the alleged victim of discrimination is a New Jersey resident.

For the reasons discussed below, I conclude that: (1) the application of the NJLAD to the Defendants based upon the facts and circumstances of this case does not violate the Due Process Clause of the United States Constitution; (2) the application of the NJLAD to the Defendants based upon the facts and circumstances of this case does not violate the Dormant Commerce Clause of the United States Constitution; (3) the NCAA is not entitled to summary judgment on Bowers's

NJLAD claim; and (4) ACT/Clearinghouse is entitled to summary judgment on Bowers's claim that it aided and abetted the NCAA in violation of the NJLAD. I also conclude that the State of New Jersey's Motion to Intervene, described below, must be granted. Additionally, Bowers's Motion to Amend, as it relates to the NJLAD, is granted.

## I. FACTUAL AND PROCEDURAL HISTORY [1]

At its core, this case tests the applicability of laws prohibiting disability-based discrimination to the practices of the NCAA. In this case, Bowers has sued the NCAA under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a) and the NJLAD. Among other claims, Bowers alleges that the NCAA discriminates against the learning disabled through initial eligibility requirements that govern whether a student may participate in intercollegiate college athletics. Bowers has also sued Temple, Iowa, and AIC for discrimination on the ground that these schools stopped recruiting Bowers to play football when they concluded that his learning disability would likely result in the NCAA declaring him a nonqualifier. Bowers has also sued ACT/Clearinghouse, which is operated by ACT, and is responsible for making eligibility determinations pursuant to the NCAA's regulations. Temple recently filed a Third–Party Complaint against Delaware State University, the University of Mem-

---

1. A complete discussion of the factual history and procedural background in this protracted case can be found in four prior published and two prior unpublished Opinions of this Court. *See Bowers v. NCAA,* 974 F.Supp. 459 (D.N.J. 1997) (Orlofsky, J.) (*Bowers I*); *Bowers v. NCAA,* 9 F.Supp.2d 460 (D.N.J.1998) (Orlofsky, J.) (*Bowers II*); *Bowers v. NCAA,* 118 F.Supp.2d 494 (D.N.J.2000)(Orlofsky, J.)(*Bowers III*); *Bowers v. NCAA,* 130 F.Supp.2d 610(D.N.J.2001)(Orlofsky, J.)(*Bowers IV*); *Bowers v. NCAA,* No. 97–2600 (D.N.J. February 6, 2001)(Orlofsky, J.)(*Bowers V*); *Bowers v. NCAA,* No. 97–2600 (D.N.J. July 3, 2001)(Orlofsky, J.)(*Bowers VI*). The Court exercises jurisdiction in this case generally pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

phis and the University of Massachusetts Amherst. Also, Bowers recently amended his First Amended Complaint to add state law claims of fraud, promissory estoppel and equitable estoppel against the University of Iowa.[2]

On November 2, 2000, I filed *Bowers III*, 118 F.Supp.2d 494 (D.N.J.2000). In *Bowers III*, I denied without prejudice the Defendants' motions for summary judgment as they related to Bowers's claims under the NJLAD.[3] Because no party had fully briefed the issue of the potential extraterritorial application of the NJLAD and whether such application would be constitutional, I granted twenty days to both Bowers and the Defendants to submit additional briefing on this issue. All parties submitted such briefing or joined another party's brief.[4]

After reviewing these supplemental briefs, I determined that it was appropriate, under 28 U.S.C. § 2403(b) and Federal Rule of Civil Procedure 24(c), to certify

to the Attorney General of the State of New Jersey that the constitutionality of the NJLAD had been called into question. By letter dated February 5, 2001, I informed the Attorney General that the constitutionality of the NJLAD had been called into question, and I invited the state to present its views on the question of whether the application of the NJLAD to the Defendants in this case would be constitutional. On March 6, 2001, the State of New Jersey filed a Motion to Intervene[5] and a brief on the issue of the constitutionality of applying the NJLAD to the Defendants in the circumstances of this case. Bowers, the NCAA and ACT subsequently submitted briefs in response to the state's brief.[6] As this issue is now thoroughly briefed, it is ready for resolution.

## II. DISCUSSION

Defendants argue that the NJLAD cannot apply to them under the facts of this case without violating the Due Process and

**2.** In *Bowers VI*, I held that the University of Iowa is not entitled to Eleventh Amendment immunity. Therefore, I allowed Bowers to amend his First Amended Complaint to allege these state law claims against the University of Iowa. While Eleventh Amendment immunity does not preclude Bowers's NJLAD claim against Iowa, Iowa also argues, like the other Defendants, that application of the NJLAD to this case would be unconstitutional under the Due Process and Dormant Commerce clauses.

**3.** There is some confusion among the parties as to whether Temple, Iowa and AIC are included in Bowers's NJLAD claim, as that claim is presented in Bowers's First Amended Complaint. Bowers has since moved to file a Second Amended Complaint to clarify that these three defendants are included under the NJLAD claim. While I have ruled on other elements of Bowers's Motion to Amend, see *Bowers V*, I have deferred ruling on whether to grant Bowers's Motion to Amend to clarify his NJLAD claim. I deferred ruling on that issue because if the application of the NJLAD to this case is unconstitutional, Bowers's Motion to Amend to clarify the NJLAD count

would be futile. Because I determine that the NJLAD may apply here, Bowers's Motion to Amend to clarify his claims under the NJLAD is granted.

**4.** AIC did not file its own supplemental brief. While this Court is not in receipt of any documentation from AIC regarding whether it wished to join any of the filed supplemental briefs, this Court is in receipt of a letter from James H. Savage, Esq., counsel for AIC, expressing AIC's desire to join the NCAA's reply to the State of New Jersey's brief, described below. Therefore, the following discussion assumes that AIC would join the NCAA's original supplemental brief as well.

**5.** The State of New Jersey's Motion to Intervene as of Right, for the limited purpose of defending the constitutionality of the NJLAD, filed on March 6, 2001, is granted.

**6.** AIC joins in the NCAA's reply to the State of New Jersey's brief, as discussed above. This Court received no documentation from Iowa or Temple in response to New Jersey's brief.

the Dormant Commerce clauses of the United States Constitution. Among other things, Defendants argue that the NJLAD may not, under the United States Constitution, apply to defendants who are not places of public accommodation within New Jersey, even if the alleged victim of discrimination is a New Jersey resident.

## A. Due Process Clause

The United States Supreme Court has employed a "contacts" analysis, similar to that used in the personal jurisdiction context, to determine whether a particular state's substantive law may be constitutionally applied to a particular set of facts. In *Allstate Insurance Company v. Hague*, the Supreme Court determined "that for a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." 449 U.S. 302, 312–13, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981). The Court explained that it "has invalidated the choice of law of a State which has had no significant contact or significant aggregation of contacts, creating state interests, with the parties and the occurrence or transaction." *Id.* at 308, 101 S.Ct. 633.

The Eighth Circuit has explained that "[t]he basic rule is the state whose law is chosen to control a case must have a substantial factual contact with the parties or the transaction giving rise to the litigation. Without sufficient contacts, the state has no legitimate interest in the outcome of the litigation." *McCluney v. Jos. Schlitz Brewing Co.*, 649 F.2d 578, 581 (8th Cir. 1981).

Therefore, under this method of analysis, to determine whether a state's substantive law may constitutionally apply to an occurrence or transaction, the relationship of the state, whose law is to be applied, to the facts at issue must be examined. The Defendants argue that New Jersey's contacts with this litigation are tenuous at best. Bowers argues that there are sufficient New Jersey contacts such that it would not offend the United States Constitution to apply New Jersey law here. Because each Defendant's relationship to New Jersey with respect to Bowers's action is unique, I will analyze each relationship separately to determine whether New Jersey law may, consistent with the Constitution, apply to Bowers's claims against each Defendant.

Before I examine New Jersey's contacts to this litigation, however, I must review some case law construing the NJLAD that provides a legal framework for the following discussion. It is relatively clear that, under New Jersey law, a plaintiff's New Jersey residence alone is not sufficient to trigger application of the NJLAD. *See, e.g., Buccilli v. Timby, Brown & Timby*, 283 N.J.Super. 6, 660 A.2d 1261 (N.J.Super.Ct.App.Div.1995)(holding that Pennsylvania law, and not the NJLAD, would govern a New Jersey resident's employment claims where the resident worked exclusively in Pennsylvania and all of the alleged unlawful conduct occurred in Pennsylvania). It is also relatively clear, however, that an "out of state" defendant may be held liable under the NJLAD if New Jersey's contacts to the factual scenario are sufficient. *See, e.g., McDonnell v. State of Illinois*, 163 N.J. 298, 748 A.2d 1105 (2000)(affirming the decision of the Superior Court, Appellate Division, that the NJLAD may apply to a New Jersey resident's employment claims against the State of Illinois where the New Jersey resident worked in a New Jersey field office of the Illinois Department of Reve-

nue). Bowers's action falls somewhere within these two extremes.

### 1. The NCAA

■ The NCAA's argument that application of the NJLAD against it in this case fails the *Allstate* analysis is mainly based on the following arguments: (1) "Bowers' allegations that he was denied access to 'places of public accommodation' involve *only* 'places of public accommodation located outside of the State of New Jersey;" (2) "Bowers never sought access to any 'places of public accommodation' located within the State of New Jersey;" and (3) "Since Bowers did not seek admission to an NCAA member institution within the State of New Jersey, the NCAA had *no contact at all* with any of the NCAA member institutions located within the State of New Jersey with regard to Michael Bowers or the NJLAD claims asserted in his lawsuit." *See* NCAA Supp. Mem. in Support of Summary Judgment on All Claims Brought Under the NJLAD ("NCAA Supp. Mem.") at 1 (emphasis in original).[7]

Additionally, the NCAA argues that the New Jersey Legislature never intended the NJLAD to have extraterritorial effect and contends that no case has applied the NJLAD to a factual scenario where a plaintiff sought access to a public accommodation located outside of New Jersey, in support of its argument that the NJLAD

may not apply here. *See* NCAA Supp. Mem. at 4–6.

The NCAA's arguments assume that the proper focus and determinative factor in this case is the location of the public accommodation to which Bowers sought access. For example, the NCAA reasons that if its allegedly discriminatory conduct is the application of the initial eligibility rules, that application could only have taken place at the public accommodations the NCAA operates, the defendant universities, and those places are not located in New Jersey. Even assuming that Bowers did not seek access to any public accommodation located in New Jersey, however, the situs of the public accommodation is only one of many potential contacts between New Jersey and the underlying facts giving rise to this litigation.

The New Jersey Supreme Court has explained that a proper consideration to determine the applicability of the NJLAD is whether the alleged discriminatory behavior "was expected or intended to cause injury in New Jersey." *Blakey v. Continental Airlines, Inc.*, 164 N.J. 38, 67, 751 A.2d 538 (2000). While the issue in *Blakey* was whether the State of New Jersey could exercise personal jurisdiction over certain defendants, the New Jersey Supreme Court's focus on whether the alleged discrimination was expected or intended to cause injury in New Jersey

---

7. Bowers argues that the NCAA, ACT and Temple "have waived any defense based upon extraterritorial application of the NJLAD" because "[n]one of these defendants asserted a defense based upon jurisdiction, either generally or under the NJLAD, or based upon extraterritorial application of the NJLAD." Pl.'s Br. in Support of Application of NJLAD at 1. In *its Answer to Bowers's First Amended Complaint, Temple included a Seventh Affirmative Defense stating, "[t]his Court lacks subject matter jurisdiction over any claim that may be stated in the Complaint." Temple also included a Twentieth Affirmative Defense

stating, "Temple is not a proper defendant under the New Jersey Law Against Discrimination." *See* Answer of Temple University (filed November 7, 1997). Similarly, the NCAA included in its Answer a Sixteenth Defense stating "This Court lacks subject matter jurisdiction." *See* Answer of the NCAA (filed June 29, 1998). Therefore, Bowers's description of the contents of Temple's and the NCAA's Answers is not correct. Additionally, while Bowers's description of ACT/Clearinghouse's Answer is more accurate, this Court may *sua sponte* raise the issue of subject matter jurisdiction. *See* Fed.R.Civ.P. 12(h)(3).

translates to the context of the *Allstate* analysis. If alleged discrimination was expected or intended to cause injury in New Jersey, that is one contact that New Jersey would have to the facts underlying subsequent litigation concerning that alleged discrimination.

An examination of other case law reveals that New Jersey courts have de-emphasized the importance of the physical situs of the public accommodation. *See National Organization of Women v. Little League Baseball, Inc.*, 127 N.J.Super. 522, 318 A.2d 33 (N.J.Super.Ct.App.Div.), *aff'd*, 67 N.J. 320, 338 A.2d 198 (1974)(holding that "[t]he statutory noun 'place' . . . is a term of convenience, not of limitation . . . employed to reflect the fact that public accommodations are commonly provided at fixed 'places' "); *Dale v. Boy Scouts of America*, 160 N.J. 562, 588–89, 734 A.2d 1196 (1999), *rev'd on other grounds*, 530 U.S. 640, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000)(following the reasoning of *Little League*, the Supreme Court of New Jersey refused to limit the definition of "place" under the NJLAD to fixed physical locations). While both *Little League* and *Dale* involved some physical "place" located within New Jersey, these cases reveal the New Jersey Supreme Court's reluctance to allow a strict definition of "place" limit the reach of the NJLAD. As explained by the Appellate Division in *Dale*, "[t]o have the LAD's reach turn on the definition of 'place' is irrational because 'places do not discriminate; people who own and operate places do.' " *Dale v. Boy Scouts of America*, 308 N.J.Super. 516, 533, 706 A.2d 270 (N.J.Super.Ct.App.Div.1998)(quoting *Welsh v. Boy Scouts of America*, 993 F.2d 1267, 1282 (7th Cir.1993))(Cummings, J., dissenting). In conjunction with the New Jersey state legislature's statutory command that the NJLAD be liberally construed, *see* N.J.S.A. § 10:5–3, this reasoning of the New Jersey Supreme Court is helpful in analyzing the NCAA's emphasis on the location of the place of public accommodation.

As explained above, the location of the place of public accommodation is but one potential contact between New Jersey and the facts underlying this litigation. The NCAA contends that virtually no qualitative connections exist between itself and New Jersey with regard to this case. As explained by the NCAA:

> The relevant NCAA rules in this case were not decided upon in New Jersey or drafted in New Jersey, and they were not specifically directed at activities or institutions located in New Jersey any more than they were directed at activities or institutions in any other state. . . . The NCAA's role in relation to New Jersey and this case is therefore an extremely limited one: it promulgated a nationwide set of rules of general applicability governing intercollegiate athletics which where allegedly applied by other parties in this litigation to a New Jersey resident seeking access to places of public accommodation located outside of New Jersey.

NCAA's Reply to the State of New Jersey's Br. at 6–8.

The NCAA's analysis underestimates the relationship between New Jersey and the facts underlying this litigation. The NCAA is correct in its assertion that the focus here is on its contacts with New Jersey concerning the operative facts giving rise to this litigation, and not on its contacts with New Jersey in general. Even that narrow category of contacts, however, is more substantial than the description portrayed by the NCAA. The NCAA's contacts with New Jersey concerning the facts underlying this litigation include: (1) distributing materials to and communicating generally with Palmyra

High School, where Bowers attended high school, regarding the eligibility process, see Bowers I, 974 F.Supp. at 462–63; (2) working with Palmyra High School to determine which of its courses would be approved as "core" courses, see Bowers I, 974 F.Supp. at 462; and (3) working with Palmyra High School to determine Bowers's eligibility, see Bowers I, 974 F.Supp. at 462–63. See also Bowers II, 9 F.Supp.2d at 468–69.[8]

Additionally, it is reasonable to conclude that the alleged discrimination on the part of the NCAA must have been expected or intended to cause injury in New Jersey. The nature of the mechanics of the process of determining eligibility compels such a conclusion. The process of determining eligibility requires a student to gather materials in his or her state of residence and send them to the NCAA for evaluation. While the actual situs of the application of the eligibility rules and the decision to grant or deny eligibility may not be in the student's home state, the NCAA, or its agent, must notify the student, in his or her home state, of his or her eligibility status to close the circle of the eligibility process. If the NCAA is the operator of a place of public accommodation, an essential function of that operation is the implementation of the eligibility rules. To perform this function, the NCAA, or its agent, must notify students of the result.

Thus, in this case, an essential part of the eligibility determination process was directed at New Jersey, Bowers's resident state. There is more contact with New Jersey here, therefore, than in Bucilli, where the plaintiff's New Jersey residence was wholly tangential to the plaintiff's employment claims against her Pennsylvania employer regarding alleged discriminatory behavior that occurred while the plaintiff was at work in Pennsylvania. The eligibil-

ity determination process in this case is not so easily contained. Communication of the eligibility determination is an essential part of the process. Therefore, the NCAA's contacts with New Jersey, under the unique facts of this case, are not tangential.

Accordingly, I conclude that the NCAA's contacts with New Jersey regarding the facts and circumstances of this case are sufficiently significant such that application of the NJLAD to the NCAA in this case is neither arbitrary or unfair. Thus, the application of the NJLAD to the NCAA in this matter does not offend the Due Process Clause of the United States Constitution.

## 2. ACT/Clearinghouse

■ ACT/Clearinghouse also argues that the application of the NJLAD to Bowers's litigation against it would be arbitrary and fundamentally unfair. ACT/Clearinghouse argues that application of the NJLAD would be arbitrary because ACT/Clearinghouse does not have significant contacts with New Jersey. In support of this argument, ACT/Clearinghouse states:

> ACT is not a New Jersey company. Its operation of the Clearinghouse takes place at ACT's offices in Iowa City, Iowa. ACT does not have offices in New Jersey, and did not send an agent to New Jersey to conduct any business with Michael Bowers. The extent of ACT/Clearinghouse's contact with Mr. Bowers has been through the mail and limited phone correspondence, and it was all initiated by Mr. Bowers or at Mr. Bowers' request. Moreover, the role of ACT/Clearinghouse has been essentially ministerial.

ACT/Clearinghouse Supp. Br. at 3. ACT/Clearinghouse argues that application

---

8. Much of this contact occurred through the NCAA's agent, ACT/Clearinghouse.

of the NJLAD would also be fundamentally unfair because "it could not reasonably be expected to be haled into a New Jersey court and subjected to New Jersey law for processing in Iowa requests for initial eligibility determinations under the NCAA's eligibility requirements." *Id.* at 4.

Like the NCAA, ACT/Clearinghouse underestimates New Jersey's contacts to this litigation. Many, if not all, of the contacts described above regarding the NCAA were carried out by ACT/Clearinghouse on behalf of the NCAA. Therefore, for the reasons discussed above regarding the NCAA, ACT/Clearinghouse's contacts with New Jersey relating to this litigation are significant enough such that it would not be arbitrary or fundamentally unfair to apply the NJLAD to ACT/Clearinghouse's alleged actions.[9]

### 3. University of Iowa

■ The University of Iowa argues that because New Jersey is not the situs of the alleged harm, the NJLAD can not constitutionally apply to this litigation.[10]  *See* Iowa Supp. Brief at 5–6. Iowa contends that because Bowers was allegedly denied access to the University of Iowa, which is a public accommodation not located in New Jersey, the situs of harm was in Iowa, and not New Jersey. Iowa also argues that it is not subject to the NJLAD because the "NJLAD defines 'place of public accommodation' to expressly include any 'trade or business school, high school, academy, college and university, or any educational institution under the supervision of the State Board of Education, or the Commissioner of Education of the State of New Jersey.'" *Id.* at 6 (citing N.J.S.A. § 10:5–5(1)). Iowa maintains that because it is not under the supervision of the State Board of Education, or the Commissioner of Education of the State of New Jersey, it is not subject to the NJLAD. *Id.*

As the above discussion reveals, this Court disagrees with Iowa's reliance on its

---

9. I reject ACT/Clearinghouse's suggestion that this Court should simply implement New Jersey's choice of law analysis to resolve this issue between the parties. See ACT/Clearinghouse Supp. Br. at 6–7. Before a choice of law analysis is undertaken, a court must first determine which state's laws may constitutionally apply to a given factual scenario. Following that determination, a choice of law analysis allows a court to determine, of those states, which state's law should govern the dispute. *See, e.g., McDonnell v. State of Illinois,* 319 N.J.Super. 324, 339–40, 725 A.2d 126 (N.J.Super.Ct.App.Div.1999)(addressing choice of law issue after determining that New Jersey law could apply to the case). Here, the Defendants contend that New Jersey law may not apply at all. Therefore, ACT/Clearinghouse's suggestion skips an important step-determining which state's law may constitutionally apply to this factual scenario. I will not entertain arguments at this late stage of this case that, even if New Jersey law may apply, some other state's law should apply as the result of a choice of law analysis. The supplemental briefing ordered by this Court only concerned the constitutionality of

applying the NJLAD. The Defendants did not adequately argue in their original summary judgment briefs that a choice of law analysis requires some other state's law to apply. While AIC did "respectfully request to reserve the right to visit the choice of law issue by way of a subsequent application" in its summary judgment reply brief, AIC also stated in that reply brief that "[i]n moving for summary judgment, AIC has not addressed the choice of law question." *See* AIC summary judgment letter reply brief at 3. I will not allow AIC to address this issue for the first time at this late stage.

10. In its supplemental brief regarding the NJLAD, Iowa confuses the issue of whether a court may exercise personal jurisdiction over a defendant with the issue of whether a state's substantive law may constitutionally apply to a given factual scenario. The latter is at issue here. The Court assumes that Iowa's personal jurisdiction argument is intended to support its contention that the State of New Jersey does not have significant contact with this litigation, thus the *Allstate* test is not satisfied.

location as a determinative factor under the *Allstate* analysis. As explained above, the location of the place of public accommodation is but one potential contact. While that specific contact does not exist in this case, Iowa engaged in other contacts with New Jersey that render application of the NJLAD to Bowers's claims against Iowa neither arbitrary nor fundamentally unfair. If the University of Iowa is an operator of a place of public accommodation, part of the operation is the recruiting process, whereby Iowa determines who gets access to its public accommodation. As part of its recruiting process, Iowa's representative traveled to New Jersey to interact with Bowers. *See Bowers III*, 118 F.Supp.2d at 513 (discussing a face to face meeting at Palmyra High School between Iowa Coach Frank Verducci and Bowers). Iowa's representative also maintained contact with employees of Palmyra High School to further Iowa's recruiting process. *See* Deposition of Frank Verducci at 83, 122–24 (attached as Ex. 25 to Plaintiff's Exhibits submitted in opposition to Defendants' motions for summary judgment)(discussing Frank Verducci's meeting in Palmyra with Palmyra High School Coach Mauer). It is not arbitrary or fundamentally unfair to apply the NJLAD to a defendant who entered the State of New Jersey and carried out other activities involving the State of New Jersey to recruit a New Jersey resident to play football in Iowa.

This Court also disagrees with Iowa's contention that Iowa is the situs, or only situs, of harm. It is reasonable to assume that Iowa's decision to terminate its efforts to recruit Bowers was intended or expected to cause injury in New Jersey. As with the eligibility process, the college athletic recruitment process is unique and does not easily "fit" into the framework of existing case law regarding the applicability of the NJLAD. This Court concludes that a student's residence is not wholly tangential to the college athletic recruitment process. This is because a student must necessarily be recruited from his or her resident state. Here, it is reasonable to conclude that Iowa knew it was engaging in conduct with a New Jersey resident and that it would be necessary to engage in other New Jersey related conduct to recruit Bowers. In fact, Iowa Coach Verducci testified that he was assigned the territory of New Jersey while he recruited for Iowa, and that he would travel to New Jersey several times each year on behalf of Iowa. *See* Deposition of Frank Verducci at 19–22. Thus, it is also reasonable to conclude that Iowa knew or expected that its allegedly discriminatory actions regarding the cessation of its recruitment of Bowers would reach into and have an effect in New Jersey.

This Court also disagrees with Iowa's contention that the language of the NJLAD quoted above excludes its application to the University of Iowa. I doubt that the phrase "or any educational institution under the supervision of the State Board of Education, or the Commissioner of Education of the State of New Jersey" is meant to limit the phrase "trade or business school, high school, academy, college and university" that precedes it. Even if it did serve such a limiting purpose, however, the definition of "a place of public accommodation, from which Iowa extracted the above quoted language, begins with the express admonition that "[a] place of public accommodation" shall include, but not be limited to:" what follows. N.J.S.A. § 10:5–5(*l*). Thus, the list of "places" contained in New Jersey Statute 10:5–5(*l*) is not exclusive.

For the reasons discussed above, this Court concludes that applying the NJLAD to Iowa under the facts of this case does

not violate the Due Process Clause of the United States Constitution.

### 4. Temple and AIC

Both Temple and AIC have joined the NCAA's supplemental briefing regarding the applicability of the NJLAD. *See* Letter from Abigail L. Flitter, Esq., dated November 22, 2000; Letter from James H. Savage, Esq., dated March 26, 2001. As discussed above, this Court rejects the NCAA's contention that application of the NJLAD to it in this case would violate the Due Process Clause of the United States Constitution. Because neither Temple nor AIC has filed its own brief on this issue, neither has described its own contacts with New Jersey regarding this litigation, or lack thereof. Therefore, this Court will not dismiss Bowers's NJLAD claim against Temple or AIC on the theory that application of the NJLAD to Temple or AIC violates the Due Process Clause due to insufficient contacts.

As the above analysis reveals, I conclude that application of the NJLAD to Bowers's claims against the NCAA, ACT/Clearinghouse, Iowa, Temple and AIC does not violate the Due Process Clause. New Jersey has sufficient contacts with this litigation such that application of its law would not be arbitrary or fundamentally unfair.

### B. Dormant Commerce Clause

The Defendants also argue that Bowers may not maintain his NJLAD claims against them because to do so would amount to an impermissible regulation of out of state conduct, a violation of the Dormant Commerce Clause of the United States Constitution.

The United States Supreme Court has developed two methods of analysis under the Dormant Commerce Clause. In *Brown–Forman Distillers Corp. v. New York State Liquor Authority*, 476 U.S. 573,

579, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986) (citations omitted), the Supreme Court explained:

> When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor instate economic interests over out of state interests, we have generally struck down the statute without further inquiry. When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits.

Regarding evenhanded statutes that produce some indirect effect on interstate commerce, the Supreme Court has further explained:

> Not every exercise of state power with some impact on interstate commerce is invalid. A state statute must be upheld if it "regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental ... unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."

*Edgar v. MITE Corp.*, 457 U.S. 624, 640, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982)(quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970)).

The Supreme Court has also stated, however, that "[t]he Commerce Clause also precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Edgar*, 457 U.S. at 643, 102 S.Ct. 2629. Additionally, the Third Circuit Court of Appeals has explained that "if [individuals or entities] were subject to

'inconsistent legislation' from different states, a law's 'practical effect' might lead to a Commerce Clause violation.... On the other hand, state laws which merely create additional, but not irreconcilable, obligations are not considered to be 'inconsistent' for this purpose." *Instructional Systems, Inc. v. Computer Curriculum Corp.*, 35 F.3d 813, 826 (3d Cir.1994).

The Defendants appear to agree that the NJLAD is not a statute that "directly regulates or discriminates against interstate commerce." *See, e.g.,* ACT/Clearinghouse Supp. Br. at 9. Despite agreement that the effect of the NJLAD in general on interstate commerce, if any, is indirect, the Defendants maintain that application of the NJLAD to this case specifically would offend the Dormant Commerce Clause. The NCAA argues that "[t]he facts here are uncontroverted that defendants allegedly discriminatory activities took place wholly outside the State. Application of New Jersey substantive law in this circumstance would have the 'practical effect' of regulating conduct beyond the boundaries of the State." NCAA Supp. Mem. at 14. Also, ACT/Clearinghouse contends that application of the NJLAD here would trigger an "inconsistent legislation" problem of the type described by the Third Circuit Court of Appeals in *Instructional Systems, Inc.* Therefore, ACT/Clearinghouse argues, application of the NJLAD here "would violate the Commerce Clause 'because of its potential interaction or conflict with similar statutes in other jurisdictions.'" ACT/Clearinghouse Supp. Br. at 10(quoting *NCAA v. Miller*, 10 F.3d 633, 639 (9th Cir.1993)).

Defendants' arguments assume that application of the NJLAD to the facts of this case would implicate the Dormant Commerce Clause and trigger the analysis described above. The Commerce Clause of the United States Constitution express-ly grants to Congress the right to regulate interstate commerce. U.S. Const. Art I, sec. 8, cl. 3. In addition to its positive grant to Congress, "the Commerce Clause has a negative or dormant aspect which limits state authority to regulate areas where 'Congress has not affirmatively acted to either authorize or forbid the challenged state activity.'" *Harvey & Harvey, Inc. v. County of Chester*, 68 F.3d 788, 796 (3d Cir.1995)(quoting *Atlantic Coast Demolition and Recycling, Inc. v. Board of Chosen Freeholders of Atlantic County*, 48 F.3d 701, 710 (3d Cir. 1995)). If Congress authorizes a state activity that may otherwise arguably violate the Dormant Commerce Clause, there is no "dormant" Commerce Clause issue. "As with any dormant commerce clause issue, '[i]t is well established that Congress may authorize the States to engage in regulation that the Commerce Clause would otherwise forbid.'" *Harvey & Harvey, Inc.*, 68 F.3d at 796 n. 8 (quoting *Maine v. Taylor*, 477 U.S. 131, 138, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986)). Bowers contends that there is no Dormant Commerce Clause issue here because Congress has authorized states to enact and enforce laws protecting the rights of those with disabilities. Therefore, Bowers argues, any disability related regulation imposed by the NJLAD that might otherwise offend the Commerce Clause does not cause concern here because Congress has authorized such regulation. Pl.'s Reply Br. Regarding Application of the NJLAD at 7. Bowers argues that the following language contained in the Americans with Disabilities Act supports his argument:

Nothing in this chapter shall be construed to invalidate or limit the remedies, rights, and procedures of any Federal law or law of any State or political subdivision of any State or jurisdiction that provides greater or equal protection

for the rights of individuals with disabilities than are afforded by this chapter. 42 U.S.C. § 12201(b). Bowers contends that, through this language and the ADA in general, Congress has exercised its right to regulate interstate commerce regarding persons with disabilities, and, through that regulation, has expressly permitted states to enact their own laws protecting those with disabilities.

I agree with Bowers's reasoning. The United States Supreme Court has explained that when "state or local government action is specifically authorized by Congress, it is not subject to the Commerce Clause even if it interferes with interstate commerce." *White v. Massachusetts Council of Construction Employers, Inc.,* 460 U.S. 204, 213, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983). In *Sea Air Shuttle Corporation v. Virgin Islands Port Authority,* 800 F.Supp. 293 (D.Vi.1992), the District Court of the Virgin Islands concluded that because the action of the Virgin Islands Port Authority complained of was specifically authorized by the Federal Aviation Act, 49 U.S.C. § 1301, the reasoning of *White* dictated that the Dormant Commerce Clause was not triggered. The same reasoning applies here. Congress, through the ADA, has authorized states to maintain their own laws that grant equal or greater rights to those with disabilities. Therefore, the Dormant Commerce Clause is not implicated here.[11] Accordingly, ap-

plication of the NJLAD to the Defendants under the facts of this case would not violate the Dormant Commerce Clause.

## C. Application of the NJLAD

Because I have determined that the NJLAD may constitutionally govern the underlying facts of Bowers's suit, I must now return to the Defendants' original summary judgment briefs to address the Defendants' arguments regarding the substantive application of the NJLAD contained in those briefs. As the Third Circuit has noted: "[o]n a motion for summary judgment, the court must determine whether the evidence shows that 'there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Abraham v. Raso,* 183 F.3d 279, 287 (3d Cir.1999) (citing Fed.R.Civ.P. 56(c)).

### 1. The NCAA

▮ In its Memorandum of Law in Support of its Motion for Summary Judgment, the NCAA argued that the NCAA is not included in the NJLAD's definition of a "place of public accommodation" because that definition excludes application of the NJLAD to any "institution, bona fide club, or place of accommodation, which is in its nature distinctly private," and the NCAA is such a "distinctly private" organization. NCAA Mem. of Law in Supp. of Sum. Judg. at 45–46; *see* N.J.S.A. § 10:5–5(*l*).[12]

**11.** Alternatively, even if I were to conclude that Congress had not adequately authorized the regulation imposed by the NJLAD, such that the Dormant Commerce Clause is implicated, application of the NJLAD to the Defendants under these facts would not violate the Dormant Commerce Clause. As the above discussion regarding the Due Process Clause indicates, application of the NJLAD here would not amount to application of a state statute to events taking place "wholly outside of the State's borders." Also, the NJLAD effectuates a strong, "legitimate local public

interest," the eradication of discrimination in society, and any incidental burden on interstate commerce is not excessive relative to the local benefit. Finally, the NJLAD does not establish an "inconsistent legislation" problem as described in *Instructional Systems, Inc.*

**12.** To the extent that the NCAA, or any other Defendant, argued in their summary judgment briefs that they are entitled to summary judgment on Bowers's NJLAD claim because Bowers was not discriminated against be-

The issue in *Frank v. Ivy Club*, 120 N.J. 73, 576 A.2d 241 (1990) was whether Princeton University's eating clubs fit the definition of a place of public accommodation under the NJLAD. Like the NCAA, the eating clubs argued they were not places of public accommodation under the NJLAD due to their distinctly private nature. The Supreme Court of New Jersey disagreed, holding that the symbiotic relationship between Princeton University and the private eating clubs subjected the clubs to the NJLAD. The Supreme Court of New Jersey explained that "[w]here a place of public accommodation and an organization that deems itself private share a symbiotic relationship, particularly where the allegedly 'private' entity supplies an essential service which is not provided by the public accommodation, the servicing entity loses its private character and becomes subject to laws against discrimination." *Id.* at 104, 576 A.2d 241.

Even if this Court were to assume that the NCAA possesses the necessary characteristics to fit the definition of "distinctly private," the reasoning of *Frank* would still subject the NCAA to the NJLAD. The NCAA and its member institutions also have a symbiotic relationship. The NCAA regulates who gets access to and what occurs on its member institution's playing fields. Thus, without its member institutions, the NCAA would serve no purpose. Likewise, the NCAA's member institutions are dependent on the NCAA to provide uniform rules that determine who gets access to and what occurs on their playing fields, a task the member schools have ceded to the NCAA. Therefore, even if the NCAA is a "distinctly private" organization under the NJLAD,[13] its symbiotic relationship with its member schools[14] subjects the NCAA to the NJLAD. Accordingly, the NCAA is not entitled to summary judgment on Bowers's NJLAD claims.[15]

cause of his disability or because Bowers was not otherwise qualified, I remind the parties that in *Bowers III* I determined, in the context of the ADA and the Rehabilitation Act, that material disputes of fact remain regarding these issues. Therefore, the Defendants are not entitled to summary judgment on Bowers's NJLAD claims based on this type of argument.

13. By assuming this, this Court does not hold that the NCAA is a "distinctly private" organization under the NJLAD.

14. The NCAA argues that the "vast majority" of its member institutions are not places of public accommodation under the NJLAD because they are not located in New Jersey. If its member institutions are not public accommodations under the NJLAD, the NCAA reasons that those institutions can not be the source of a symbiotic relationship. NCAA Mem. of Law in Supp. of Sum. Judg. at 46 n. 21. The NCAA bases its argument that its non—New Jersey member institutions are not places of public accommodation under the NJLAD on the language of the NJLAD stating that the definition of a place of public accom-

modation includes any "trade or business school, high school, academy, college and university, or any educational institution under the supervision of the State Board of Education, or the Commissioner of Education of the State of New Jersey." N.J.S.A. § 10:5–5(*l*). The NCAA contends that this language excludes application of the NJLAD to an educational institution located outside of New Jersey. As I explained above, Iowa makes the same argument in support of its contention that the NJLAD is not applicable to it. For the same reasons expressed in response to Iowa's argument, I reject the NCAA's contention as well.

15. The NCAA also argues that it is exempt from the NJLAD under N.J.S.A. § 10:5–5(*l*), which provides that the NJLAD does not bar a "private secondary or postsecondary school from using in good faith criteria other than [prohibited considerations] in the admission of students." NCAA Mem. of Law in Supp. of Sum. Judg. at 46 n. 21. The essence of Bowers's claim, however, is that the NCAA engaged in unlawful discrimination against him. Therefore, the NCAA is not entitled to summary judgment based on this argument.

## 2. ACT/Clearinghouse

█ In its brief in support of its Motion for Summary Judgment, ACT/Clearinghouse argues that even if the NJLAD is applicable to this action, there is not sufficient evidence in the summary judgment record to support Bowers's claim that ACT/Clearinghouse is liable under the aiding and abetting provision of the NJLAD.[16]

Under the NJLAD, it is unlawful, "for any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of the acts forbidden under this act, or to attempt to do so." N.J.S.A. § 10:5-12(e). ACT/Clearinghouse argues that Bowers can not support his claim that ACT/Clearinghouse violated this provision of the NJLAD because: (1) ACT/Clearinghouse's liability under this provision is tied to the NCAA's potential liability, and the NCAA is not liable; and (2) even if the NCAA is liable under the NJLAD, ACT/Clearinghouse "lacked the requisite knowledge of, and did not meaningfully participate in, any such discrimination." ACT/Clearinghouse Summ. Judg. Br. at 25.

As discussed above, the NJLAD may substantively govern Bowers's claims against the NCAA. Therefore, whether the NCAA violated the NJLAD in its treatment of Bowers is still an open question. Because the NCAA is still potentially liable under the NJLAD, ACT/Clearinghouse is also still potentially liable under the aiding and abetting provision of the NJLAD.

ACT/Clearinghouse's second argument, that the summary judgment record is devoid of proof of the requisite mental state or behavior necessary to find liability under the NJLAD's prohibition on aiding and abetting, requires more detailed analysis. In *Failla v. City of Passaic*, 146 F.3d 149, 158 (3d Cir.1998), an employment discrimination case, the Third Circuit predicted that the New Jersey Supreme Court would follow the Restatement (Second) of Torts and hold an employee liable for aiding and abetting a violation of the NJLAD when he or she "knowingly gives substantial assistance or encouragement." *Failla*, 146 F.3d at 158. The Court emphasized that employees cannot be held liable "merely because they had some role, or knowledge or involvement[;]" rather, the degree of culpability must meet the heightened standard set forth by the Restatement. *Id.* at 159. The Third Circuit also explained that "inaction can form the basis of aiding and abetting liability if it rises to the level of providing substantial assistance or encouragement." *Id.* at 158 n. 11.

The Third Circuit expanded on its discussion of aiding and abetting liability under the NJLAD in *Hurley v. Atlantic City Police Department*, 174 F.3d 95 (3d Cir. 1999). The Third Circuit explained that:

the tort of aiding and abetting involves three elements: '(1) the party whom the

---

**16.** The briefing by ACT/Clearinghouse and Bowers on this issue has been prolific, to say the least. Bowers filed a Motion for Leave to File a Surreply in conjunction with the original round of summary judgment briefing, which contained argument concerning the aiding and abetting issue. I granted this motion in *Bowers III. See Bowers III*, 118 F.Supp.2d at 534 n. 36. Additionally, both parties have continued to address this issue in their supplemental briefing regarding the constitutionality of the application of the NJLAD to this case. This Court requested supplemental briefs solely on the threshold issue of the constitutionality of applying New Jersey law. The parties' arguments regarding aiding and abetting liability have moved beyond the threshold issue and concern the substantive application of the NJLAD. Because this Court did not request additional briefing on that topic, I will not consider any arguments regarding aiding and abetting made by either ACT/Clearinghouse or Bowers beyond Bowers's surreply.

defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation.'

*Hurley,* 174 F.3d at 127 (quoting *Halberstam v. Welch,* 705 F.2d 472, 477 (D.C.Cir. 1983)). The Third Circuit also reiterated the Restatement's list of factors to consider to determine whether the "substantial assistance" requirement is satisfied. Those factors are "the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other and his state of mind." *Hurley,* 174 F.3d at 127 n. 27 (quoting Restatement (Second) of Torts § 876). The Third Circuit also referenced another factor, specifically, the duration of the assistance provided. *Hurley,* 174 F.3d at 127 n. 27 (quoting *Halberstam,* 705 F.2d at 484).

In *Gardenhire v. New Jersey Manufacturers Insurance Company,* 333 N.J.Super. 219, 228, 754 A.2d 1244 (N.J.Super. Law Div.2000), the New Jersey Superior Court, Law Division, adopted the Third Circuit's analysis of aiding and abetting liability under the NJLAD. The issue in *Gardenhire* was "whether a workers' compensation adjuster's conduct in investigating and recommending denial of plaintiff's workers compensation claim was a violation of the aiding and abetting provisions [of the NJLAD]." 333 N.J.Super. at 221, 754 A.2d 1244. The court determined that the plaintiff had not submitted sufficient evidence to meet the standard expressed in *Failla* and *Hurley.* The court concluded that while the defendant may have had notice of the alleged discriminatory conduct, the record was devoid of evidence that the defendant "had any role as part of an overall scheme to discriminate" or that

the defendant "knowingly and substantially assisted" in the alleged discrimination. *Id.* at 229, 754 A.2d 1244.

Bowers offers the following evidence in support of his contention that there is sufficient evidence in the summary judgment record that ACT/Clearinghouse "knowingly and substantially assist[ed] the principal violation": (1) testimony that it was generally known that ACT/Clearinghouse would not approve learning disabled courses as core courses; (2) documentation that reveals that ACT/Clearinghouse must have known of the Department of Justice's concerns regarding the treatment of learning disabled students under the NCAA's eligibility rules; (3) documentation that reveals that ACT/Clearinghouse rarely, if ever, approved courses for learning disabled students as core courses. *See* Pl.'s Surreply Br. at 10–13. Bowers argues that this evidence is sufficient to support his claim that ACT/Clearinghouse knew it was discriminating against learning disabled students and continued to do so, thus aiding and abetting the NCAA's discriminatory ways.

Viewing the evidence listed above in the light most favorable to Bowers, this evidence reveals, at most, that ACT/Clearinghouse had notice that the NCAA's eligibility rules were under scrutiny and that application of those rules rarely resulted in core course credit for learning disabled courses. As in *Gardenhire,* this evidence falls short of proof that ACT/Clearinghouse "had any role as part of an overall scheme to discriminate" or that ACT/Clearinghouse "knowingly and substantially assisted" in discrimination.

A review of the Restatement's factors interpreting the phrase "substantial assistance" exposes the weakness of the evidence presented by Bowers. Again, those factors are "the nature of the act encour-

aged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other and his state of mind." Bowers has not brought any evidence in the summary judgment record to this Court's attention that would prove that ACT/Clearinghouse engaged in any behavior that encouraged the NCAA's alleged discrimination. Additionally, Bowers has not pointed this Court to any evidence which would establish that ACT/Clearinghouse "knowingly" facilitated ongoing discrimination by the NCAA. The evidence presented by Bowers would prove, at best, that ACT/Clearinghouse "had some role, or knowledge or involvement." As discussed above, the Third Circuit determined in *Failla* that such proof is insufficient.

This case is substantially different than *Hurley*. In *Hurley*, the Third Circuit determined that the plaintiff submitted sufficient proof that her supervisor had tolerated and encouraged the sexual harassment directed at her, explaining that "[i]nstead of taking steps to assist her, he [the plaintiff's supervisor] told her that she should stop complaining or it would only get worse; he suggested that sleeping with him might protect her; he laughed at the drawings and graffiti about her . . . ." *Hurley*, 174 F.3d at 127.

While this case is not an employment discrimination case, Bowers has not directed this Court to any evidence in the summary judgment record that, if believed, could establish the type of substantial assistance or encouragement that is unlawful under the NJLAD. Therefore, ACT/Clearinghouse is entitled to summary judgment on Bowers's claim that it violated the aiding and abetting provision of the NJLAD.

## III. CONCLUSION

For the reasons discussed above, I conclude that: (1)the application of the NJLAD to the facts of this case does not violate the Due Process Clause of the United States Constitution; (2) the application of the NJLAD to the facts of this case does not violate the Dormant Commerce Clause of the United States Constitution; (3) the NCAA is not entitled to summary judgment on Bowers's NJLAD claim; and (4) ACT/Clearinghouse is entitled to summary judgment on Bowers's claim that it aided and abetted the NCAA in violation of the NJLAD. The motion of the State of New Jersey to intervene is granted. Additionally, Bowers's Motion to Amend, as it relates to the NJLAD, is granted. The Court will enter an appropriate form of order.

## ORDER

This matter having come before the Court on the Court's request for additional briefing on Defendants' motions for summary judgment, Barbara E. Ransom, Esq. and Max Lapertosa, Esq. of the Public Interest Law Center of Philadelphia and Richard L. Bazelon, Esq. of Bazelon, Less & Feldman, P.C., appearing on behalf of Plaintiff Michael Bowers, and Charles J. Vinicombe, Esq., J. Freedley Hunsicker, Jr., Esq., John Schultz, Esq., Julianne Peck, Esq., Amy E. Pizzutillo, Esq. of Drinker, Biddle & Shanley LLP, appearing on behalf of Defendant National Collegiate Athletic Association ("NCAA"), and Robert A. Burgoyne, Esq. of Fulbright & Jaworski LLP, Nicholas M. Kouletsis, Esq. of Pepper Hamilton, LLP, appearing on behalf of Defendants ACT, Inc. and NCAA Initial Eligibility Clearinghouse ("ACT/Clearinghouse"), and Mark Schantz, Esq., Andrew Ives, Esq. of Office of the General Counsel of the University of Iowa, and Thomas J. Miller, Esq., Attorney General, Gordon E. Allen, Esq., Deputy Attorney General, Office of the Iowa

Attorney General, William O. Perkins, Jr., Esq., Jack Jay Wind, Esq. of Margulies, Wind, Herrington & Knopf, P.C., appearing on behalf of Defendant University of Iowa ("Iowa"), and John B. Langel, Esq., Abigail L. Flitter, Esq. of Ballard Spahr Andrews & Ingersoll, LLP, appearing on behalf of Defendant Temple University of the Commonwealth System of Higher Education ("Temple"), and James H. Savage, Esq. of Ruprecht, Hart & Weeks, LLP, appearing on behalf of Defendant American International College ("AIC"), and John J. Farmer, Jr., Esq., Attorney General of New Jersey and Jeffrey C. Burstein, Esq., Senior Deputy Attorney General of New Jersey, appearing on behalf of Intervenor, The State of New Jersey, and John James Peirano, Jr., Esq. of Carpenter, Bennett & Morrissey, appearing on behalf of Third–Party Defendant, University of Massachusetts Amherst, and Peter L. Frattarelli, Esq. of Archer & Greiner, appearing on behalf of Third–Party Defendant, University of Memphis, and Michael K. Willison, Esq. of Dickie, McCamey & Chilcote, appearing on behalf of Third–Party Defendant, Delaware State University; and,

The Court having considered the submissions of the parties, for the reasons set forth in the OPINION filed concurrently with this ORDER;

IT IS, on this 6th day of August, 2001, hereby ORDERED that:

(1) Defendants' motions for summary judgment are DENIED with respect to Bowers's claims under the NJLAD, except that;

(2) ACT/Clearinghouse's Motion for Summary Judgment is GRANTED with respect to Bowers's claim that ACT/Clearinghouse aided and abetted the NCAA in violation of the NJLAD;

(3) The State of New Jersey's Motion to Intervene is GRANTED;

(4) Bowers's Motion to Amend, as it relates to the NJLAD, is GRANTED.