Michael BOWERS, Plaintiff,

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, ACT, INC., NCAA Initial–Eligibility Clearinghouse, Temple University of the Commonwealth System of Higher Education, University of Iowa, American International College, Defendants,

Temple University of the Commonwealth System of Higher Education, Defendant and Third–Party Plaintiff,

v.

Delaware State University, University of Memphis, University of Massachusetts Amherst, Third–Party Defendants.

No. CIV. A. 97–2600.

United States District Court,
D. New Jersey.

Nov. 7, 2001.

Barbara E. Ransom, Max Lapertosa, Public Interest Law Center of Philadelphia, Philadelphia, PA, Richard L. Bazelon, Bazelon, Less & Feldman, P.C., Marlton, NJ, for Plaintiff, Michael Bowers.

Charles J. Vinicombe, J. Freedley Hunsicker, Jr., John Schultz, Julianne Peck, Amy E. Pizzutillo, Drinker, Biddle & Shanley LLP, Princeton, NJ, for Defendant, National Collegiate Athletic Association.

Robert A. Burgoyne, Fulbright & Jaworski LLP, Washington, DC, Nicholas M. Kouletsis, Pepper Hamilton, LLP, Cherry Hill, NJ, for Defendants, ACT, Inc. and NCAA Initial Eligibility Clearinghouse.

Mark Schantz, Andrew Ives, Office of the General Counsel, University of Iowa, Iowa City, IA, Thomas J. Miller, Attorney General, Gordon E. Allen, Deputy Attorney General, Office of the Iowa Attorney General, Des Moines, IA, William O. Perkins, Jr., Jersey City, NJ, Jack Jay Wind, Margulies, Wind, Herrington & Knopf, P.C., Jersey City, NJ, for Defendant, University of Iowa.

John B. Langel, Abigail L. Flitter, Ballard Spahr Andrews & Ingersoll, LLP, Philadelphia, PA, for Defendant and Third–Party Plaintiff, Temple University of the Commonwealth System of Higher Education.

James H. Savage, Ruprecht, Hart & Weeks, LLP, Millburn, NJ, for Defendant, American International College.

John J. Farmer, Jr., Attorney General of New Jersey, Jeffrey C. Burstein, Senior Deputy Attorney General, The State of New Jersey, Newark, NJ, for Intervenor, The State of New Jersey.

Linda B. Celauro, John James Peirano, Jr., Carpenter, Bennett & Morrissey, Newark, NJ, for Third–Party Defendant, University of Massachusetts Amherst.

Peter L. Frattarelli, Archer & Greiner, A Professional Corporation, Haddonfield, NJ, for Third–Party Defendant, University of Memphis.

Michael K. Willison, Dickie, McCamey & Chilcote, Lawrenceville, NJ, for Third–Party Defendant, Delaware State University.

OPINION

ORLOFSKY, District Judge.

## I. INTRODUCTION

Can states be made to pay damages for violating Title II of the Americans with Disabilities Act? That controversial question lies at the heart of this motion, the latest in a long series of difficult issues stemming from the claims by Michael Bowers, a young, learning-disabled football player, that discrimination based upon his learning disability has prevented him from receiving an athletic scholarship to college. The Plaintiff's latest Complaint names some, but apparently not all, of the colleges with whom he sought to play football. As a result, one of the named defendant universities interpleaded a trio of third-party defendant schools, public universities all, from whom it seeks contribution in the event of a damages verdict against it. Thus, although of somewhat lesser public moment, the availability or not of a right to contribution under federal and New Jersey laws prohibiting discrimination against the disabled is also a critical question in the present motion. The Third–Party Defendants have now moved to dismiss the Third–Party Complaint, pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6), arguing principally that there is no such right to contribution, or, alternately, that since they would have sovereign immunity from suit by the Plaintiff, the Third–Party Plaintiff can have no basis for contribution.

I conclude, however, that there is a right to contribution in such cases, and that, in enacting Title II of the Americans with Disabilities Act, Congress validly abrogated the sovereign immunity of the States embodied in the Eleventh Amendment to the United States Constitution. I also conclude that the State of Tennessee, at least, waived its Eleventh Amendment immunity from suit when it accepted federal funds pursuant to the terms of the Rehabilitation Act. Thus, for the reasons set forth more fully below, I shall grant the Third–Party Defendants' motions in part and deny them in part with prejudice. I shall also deny the motions by two of the Third–Party Defendants to dismiss the Third–Party Plaintiff's claims for contribution under New Jersey law without prejudice to the Third–Party Defendants' opportunity to renew their motions pending submission of additional materials supporting their entitlement to claim their parent state's sovereign immunity.

## II. FACTS AND PROCEDURAL HISTORY

This is the eighth opinion I have issued in the course of adjudicating the claims asserted by Plaintiff, Michael Bowers ("Bowers"), that he was discriminated against by various entities as a result of his disability. *See Bowers v. NCAA*, 974 F.Supp. 459 (D.N.J.1997) (*Bowers I*); *Bowers v. NCAA*, 9 F.Supp.2d 460 (D.N.J. 1998) (*Bowers II*); *Bowers v. NCAA*, 118 F.Supp.2d 494 (D.N.J.2000)(*Bowers III*); *Bowers v. NCAA*, 130 F.Supp.2d 610(D.N.J.2001)(*Bowers IV*); *Bowers v. NCAA*, No. 97–2600 (D.N.J. Feb. 6, 2001)(unpublished)(*Bowers V*); *Bowers v. NCAA*, No. 97–2600 (D.N.J. July 3, 2001)(unpublished)(*Bowers VI*); *Bowers v. NCAA*, 151 F.Supp.2d 526 (D.N.J.2001) (*Bowers VII*). The essential facts underlying Bowers's Complaint are by now well rehearsed, to say the least.

Briefly, Bowers was a talented high-school football player, who sought to parlay his skills on the football field into an athletic scholarship at a four-year university. He was "recruited" by a number of the defendant institutions, including Temple University of the Commonwealth System of Higher Education ("Temple"), the University of Iowa ("Iowa"), and American International College ("AIC"). That is, he talked with representatives from the schools, and from their football teams, about the possibility that the school would offer him a scholarship. Bowers has alleged that some of these conversations involved actual promises to grant him a scholarship.

All of the defendant and third-party defendant universities are members of the National Collegiate Athletic Association ("NCAA"). The NCAA, by the consent of its members, sets minimum standards of academic preparedness for student-athletes entering college. *See Bowers II*, 9 F.Supp.2d at 467. Students who do not meet the NCAA's "initial eligibility" requirements cannot compete in intercollegiate athletics their freshman year, and face certain other restrictions on their practice time and their eligibility to receive financial assistance from their college or university. *Id.* at 467–68. In order to establish eligibility, a student must have successfully completed at least thirteen "core" courses, as defined by the NCAA. *Id.* at 468. Core courses taught below the "regular instructional level" for the student's secondary school will only be counted if the student or a college or university applies for, and is granted, a waiver of the core course requirement for that student. *Id.* Waivers are based on an individualized assessment of the student's record, pursuant to a consent decree entered into between the NCAA and the United States Department

of Justice, under which review must be by experts in the field of special education.

The NCAA initially determined that Bowers had taken only three of its required thirteen core courses. *See Id.*. It concluded, as a result, that he was a "non-qualifier"—that is, not eligible to play football or receive an athletic scholarship at least for his freshman year, and possibly for longer. *See id.* at 467, 469. The NCAA's determination was based on the fact that, as a result of a diagnosed learning disability, Bowers had been enrolled primarily in special education classes, which the NCAA found to be below "regular instructional level." *See Bowers I,* 974 F.Supp. at 462; *Bowers II,* 9 F.Supp.2d at 467, 469. After the commencement of this suit, I ordered the NCAA to review Bowers's request for a waiver under the NCAA bylaws. *See Bowers I,* 974 F.Supp. at 463. Although the NCAA's Subcommittee, on review, gave Bowers credit for several more core classes, it still concluded he was well short of the thirteen needed to make him a "qualifier." *Id.* at 464.

News of Bowers's non-qualifier status had a devastating effect on his prospects for a football scholarship. All of the efforts to recruit Bowers by the various defendant institutions, including Temple, Iowa, and AIC, were contingent on the assumption that he would be a "qualifier." *See Bowers II,* 9 F.Supp.2d at 469. Although Bowers subsequently enrolled at Temple, he did so as an ordinary student; he did not play football, nor did he receive an athletic scholarship. 2d Am. Compl. at ¶¶ 141–44.[1]

On May 23, 1997, Bowers initiated this suit, seeking injunctive relief, and perhaps damages, against the NCAA, and certain of its officers, pursuant to the Americans with Disabilities Act, 42 U.S.C. §§ 12101–213 (2000) ("ADA"), Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a) (2000) ("Rehab.Act"), and the Sherman Act, 15 U.S.C. §§ 1–37 (2000). On September 8, 1997, Bowers filed an Amended Complaint, which for clarity I will now refer to as the First Amended Complaint, dropping the officer defendants and adding ACT, Inc. and the NCAA Initial Eligibility Clearinghouse, the NCAA's contractors, as well as Defendants, Temple, Iowa, and AIC. The First Amended Complaint also asserted claims under the New Jersey Law Against Discrimination, N.J. Stat. Ann. §§ 10:5–1 to –42 (West 1993 & Supp.2001) against all defendants, and claims under New Jersey contract law against NCAA's contractors.

I subsequently dismissed all of Bowers's Sherman Act claims, *see Bowers II,* 9 F.Supp.2d at 466, as well as all claims against ACT, Inc. and the Clearinghouse, *see id.; Bowers III,* 118 F.Supp.2d at 500; *Bowers VII,* 151 F.Supp.2d at 541–43. I also concluded that Bowers has standing to pursue his Rehab. Act claims only to the extent that he seeks money damages for intentional discrimination. *See Bowers III,* 118 F.Supp.2d at 503–04. Because I found that Bowers had no standing to seek injunctive relief, and Title III of the ADA provides private parties only with injunctive relief, I dismissed his Title III claims. *See Bowers IV,* 130 F.Supp.2d at 614. I then permitted Bowers to amend his Complaint to clarify that he was seeking noninjunctive relief under the Rehab. Act against AIC, and under both the ADA and the Rehab. Act against Temple and Iowa. *See Bowers V,* slip op. at 4. In the course of ruling on Bowers's Motion for Leave to Amend, I determined that compensatory damages are available under Title II of the ADA ("Title II") only if intentional discrimination is alleged. *Id.* at 7–8. Since

---

**1.** Bowers was enrolled at Temple for only one semester, in the Spring of 1997.

Bowers has alleged intentional discrimination in violation of Title II, I permitted him to amend his Complaint to clarify that he is seeking compensatory damages under that Title. *Id.; see also* 2d Am. Compl., Count I Requested Relief ¶ 8. In addition, I concluded that the University of Iowa is not an arm of the State of Iowa, such that it was appropriate to allow Bowers to amend his Complaint to seek damages under common law theories of promissory estoppel, equitable estoppel, and fraud against Iowa. *See Bowers VI*, slip op. at 25–26.

During the pendency of Bowers's Motion for Leave to Amend, Temple sought leave to add as third-party defendants, Delaware State University ("Delaware State"), the University of Memphis ("Memphis"), and the University of Massachusetts Amherst ("U.Mass."). I granted Temple's Motion on November 17, 2000, and on November 21, 2000, Temple filed a third-party complaint against Delaware State, Memphis, and U. Mass. (collectively, "Third–Party Defendants"). U. Mass. filed this Motion to Dismiss for Failure to State a Claim, pursuant to Fed.R.Civ.P. 12(b)(6), on April 11, 2001. On April 20, 2001, Memphis filed its own Motion to Dismiss for Failure to State a Claim, as well as a Motion to Dismiss for Lack of Subject Matter Jurisdiction, pursuant to Fed.R.Civ.P. 12(b)(1). Delaware State has joined both of Memphis' motions.[2]

I have jurisdiction over Bowers's claims under the ADA and Rehab. Act pursuant to 28 U.S.C. §§ 1331 and 1343(a), and supplemental jurisdiction over his claims under New Jersey state law pursuant to 28 U.S.C. § 1367. I have jurisdiction over Temple's claims pursuant to 28 U.S.C. § 1367(a).

## III. DISCUSSION

### A. Rule 12(b)(6) Standard

Federal Rule of Civil Procedure 12(b)(6) governs motions to dismiss for failure to state a claim upon which relief may be granted. "In considering a Rule 12(b)(6) motion, the Court may dismiss a complaint if it appears certain the plaintiff cannot prove any set of facts in support of its claims which would entitle it to relief." *Mruz v. Caring, Inc.*, 39 F.Supp.2d 495, 500 (D.N.J.1999) (Orlofsky, J.) (citing *Ransom v. Marrazzo*, 848 F.2d 398, 401 (3d Cir.1988)). "While all well-pled allegations are accepted as true and reasonable inferences are drawn in the plaintiff's favor, the Court may dismiss a complaint where, under any set of facts which could be shown to be consistent with a complaint, the plaintiff is not entitled to relief." *Id.* (citing *Gomez v. Toledo*, 446 U.S. 635, 636, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980); *Schrob v. Catterson*, 948 F.2d 1402, 1405 (3d Cir. 1991); *Markowitz v. Northeast Land Co.*, 906 F.2d 100, 103 (3d Cir.1990)); *see also Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Finally, Rule 12(b)(6) authorizes a court to dismiss a claim on a dispositive issue of law. *Neitzke v. Williams*, 490 U.S. 319, 326, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989).

**2.** As the basis for their Rule 12(b)(1) Motion, Memphis and Delaware State have asserted that Title II of the ADA and Section 504 of the Rehab. Act unconstitutionally abrogate their sovereign immunity as alter egos of their respective states. Accordingly, pursuant to 28 U.S.C. § 2403(a), I certified to the Attorney General of the United States, by letter dated August 7, 2001, that the constitutionality of one of the laws of the United States had been challenged, and invited the United States to intervene. The United States Department of Justice, Division of Civil Rights, informed me, in a telephone call to my chambers on October 11, 2001, that the United States would not intervene or file briefs at this time.

## B. Whether Temple May Assert Claims for Contribution Under Title II and the Rehab. Act

### 1. Whether a Right to Contribution Exists Under Title II or Under the Rehab. Act

▮ In their Rule 12(b)(6) filings, the Third–Party Defendants each assert that neither the Rehab. Act nor Title II of the ADA creates a right of action for third-party plaintiffs to seek contribution from defendants not named by the principal plaintiff. *See* U. Mass.'s Br. at 4; Memphis's R. 12(b)(6) Br. at 2–3. Neither statute expressly creates a right to contribution. *See* 42 U.S.C. § 12133 (2000); [3] 29 U.S.C. § 794a(a)(2) (2000).[4] Ordinarily, when Congress has explicitly provided a remedial scheme for a statute, and chosen to omit a right of contribution, the presumption is that a court should not imply one. *See Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 639–40, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981); *Northwest Airlines, Inc. v. Transp. Workers Union of Am.*, 451 U.S. 77, 93–94, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981). Indeed, to the extent that a right to contribution is, in effect, an independent right of action-as is strongly implied by both *Texas Industries* and *Northwest Airlines*-implication is now all but impossible. *See Alexander v. Sandoval*, 531 U.S. 1049, 532 U.S. 275, 121 S.Ct. 1511, 1519–20, 149 L.Ed.2d 517 (2001).

▮ However, when courts have themselves implied a right of action under a statute, the addition of a right to contribution is simply one of the "elements or aspects of the [enforcement] apparatus" to be fine-tuned by the courts. *Musick, Peeler & Garrett v. Employers Ins. of Wausau*, 508 U.S. 286, 295, 113 S.Ct. 2085, 124 L.Ed.2d 194 (1993). Where the right to contribution does not involve "conduct subject to liability under an express remedial provision fashioned by Congress," or extend to "conduct not already subject to liability through private suit," a court may properly infer a right to contribution. *Id.* at 292, 113 S.Ct. 2085. An inference of a right to contribution is well-supported when it is "consistent with the overall structure" of the underlying legislation, not in conflict with any expressly created rights of action, "promote[s] clarity, consistency, and coherence for those who rely upon, or are subject to ... liability," and "effect[s] Congress' objectives." *Id.* at 295, 113 S.Ct. 2085.

▮ In my view, a right to contribution is an appropriate complement to the other judicially-implied remedies under Title II and the Rehab. Act. Title II incorporates by reference the remedies available under the Rehab. Act, which in turn incorporates the remedies available under Title VI of the Civil Rights Act. *See* 42 U.S.C. § 12133 (2000); 29 U.S.C. § 794a(a)(2) (2000). There is a judicially-implied private right of action available for enforce-

---

**3.** Title II of the ADA provides that: "The remedies, procedures, and rights set forth in section 794a of Title 29 shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of section 12132 of this title." 42 U.S.C. § 12133 (2000).

**4.** The Rehab. Act states: "The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 shall be available to

any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title." 29 U.S.C. § 794a(a)(2) (2000). Title VI of the Civil Rights Act does not expressly address the availability of remedies, either. *See Guardians Ass'n v. Civil Service Comm'n of N.Y.*, 463 U.S. 582, 593–95, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983) (opinion of White, J.).

ment of section 601 of Title VI, the parallel substantive section to section 794 of the Rehab. Act. *See Sandoval,* 121 S.Ct. at 1516 (citing *Guardians Ass'n v. Civil Service Comm'n of New York,* 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983)).[5]

It might be argued that the cross-reference language in Title II and in the Rehab. Act is intended to adopt the remedies and standards in place at the time of the Acts' adoption, rather than to authorize judicially-constructed remedies. Congress, however, clearly believed that the available remedies under the ADA would shift as the remedies for the cross-referenced statutes shifted. *See* H.R.Rep. No. 101–485(III) (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 489 ("As with other titles of the bill ... if the remedies and procedures change in title II of the 1964 act ... they will change identically in this title....."). Indeed, this feature of the bill prompted a proposed amendment to replace the cross-reference with express remedial provisions. The amendment was ultimately rejected, however, and during the debates surrounding the amendment, its opponents were emphatic that they believed it was essential that the law provide the same remedies for discrimination against the disabled as were available to racial and other minorities. *See* 136 Cong. Rec. H2599, 2615 (1990) (statement of Rep. Edwards); *id.* at 2616 (statement of Rep. Fish); *id.* at 2619 (statement of Rep. Hawkins); *id.* at 2620 (statement of Rep. Mazzoli); *id.* at 2621 (statement of Rep. Bennett); *id.* (statement of Rep. Brooks); *id.* at 2621–22 (statement of Rep. Owens).

Additionally, given the doctrinal uncertainty surrounding Title VI remedies at the time the Rehab. Act was amended, *see Regents of Univ. of Cal. v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978); Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments of 1978, Pub.L. 95–602, 92 Stat. 2982 (Nov. 6, 1978), and at the time the ADA was enacted, *see, e.g., Guardians,* 463 U.S. *passim,* it seems implausible that Congress intended to identify one definitive set of remedies. I conclude, therefore, that Title II and the Rehab. Act, by cross-referencing a judicially-implied right of action, intended to license implication and administration of a private right of action by the judiciary. *See Garcia v. S.U.N.Y. Health Sci. Ctr. of Brooklyn,* —— F.3d ——, ——, 2001 WL 1159970, at *8 (2d Cir.2001) ("[B]y referencing Title VI's remedial scheme, Title II (and § 504 of the Rehabilitation Act) incorporate an implied private right of action.").[6]

Since the remedies under the ADA and the Rehab. Act are judicially implied and administered, I turn to *Musick,* rather than *Texas Instruments* or *Northwest Airlines,* to determine the existence of a right to contribution. There are few indications whether a right to contribution is generally consistent or inconsistent with the overall structure of the ADA or the Rehab. Act. The legislative history of Title II suggests that Congress expected it would include "the full panoply of remedies," although as I note, *infra,* there were important qualifications to that expecta-

---

5. However, in the Court's view, suits brought under section 601 itself were limited to instances of intentional discrimination. *See Sandoval,* 121 S.Ct. at 1517–18.

6. In reaching this conclusion, I recognize that private rights of action are no longer to be found by implication, and that, unlike Title IX, the ADA and the Rehab. Act Amendments were not enacted with a contrary expectation. *See Cannon v. Univ. of Chicago,* 441 U.S. 677, 698–99, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). Perhaps the most accurate terminology would be to say that the ADA and the Rehab. Act expressly create remedies whose scope is to be shaped by the judiciary.

tion. H.R.Rep. No. 101–485(II) (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 381. More significantly, a right of contribution both furthers the purposes of the Act, and enhances predictability for those regulated by it. Ordinary private plaintiffs may often be ignorant of the scope of the relationships among entities who jointly cause them harm, and these relationships may remain obscure even after discovery. The defendant entity is usually in a better position to know the identity and culpability of potential tortfeasors. Thus, contribution allows the law to reach defendants who might otherwise escape liability, and perhaps continue to discriminate undeterred. Contribution also helps to ensure that damages will correspond more closely to the scope of each defendant's participation in the discriminatory activity, rather than randomly imposing the plaintiff's full harm on whatever entity happens to present the "face" of discrimination to that plaintiff.

It is appropriate, therefore, for this Court to permit a right to contribution as part of the Title II and Rehab. Act remedial schemes. I note that two other district courts have found that there is no right to contribution under the ADA. *See Pattison v. Meijer, Inc.,* 897 F.Supp. 1002, 1009 (W.D.Mich.1995); *Lane v. U.S. Steel,* 871 F.Supp. 1434, 1436–37 (N.D.Ala.1994). Both of those cases, however, involved claims under Title I of the ADA, whose remedy cross-references Title VII of the Civil Rights Act. As a result, they fell clearly within the holding of *Northwest Airlines,* which involved a right to contribution under Title VII. *See Northwest Airlines,* 451 U.S. at 79–80, 101 S.Ct. 1571; *see also Coleman v. Casey County Bd. of Educ.,* 686 F.2d 428, 430 n. 1 (6th Cir.1982) (reserving question whether there is a right of contribution under the Rehab. Act).

## 2. The Elements of a Contribution Claim

Typically, in order to establish a claim for contribution, a third-party plaintiff must show that it has borne an unjust share of a common liability with the third-party defendant. *See Northwest Airlines,* 451 U.S. at 87–88, 101 S.Ct. 1571 (citing *Restatement (Second) of Torts* § 886A (1979); William L. Prosser, *Law of Torts* § 50, at 307–09 (4th ed.1971)). That is, the third-party defendant must have been "at least partially responsible" for the "same injury" to the "same plaintiff," and, if the principal plaintiff had so chosen, he must have been able to make out a claim for money damages against the third-party defendant. *Id.* at 87–89, n. 20, 101 S.Ct. 1571; *see also* W. Page Keeton et al., *Prosser & Keeton on Torts* § 50, at 339–40 (5th ed.1984). Thus, if the third-party defendant would have been immune from suit by the principal plaintiff, there can be no claim for contribution. *See id.*

## 3. Whether Temple and the Third-Party Defendants are Liable for the Same Injury to the Same Plaintiff

U. Mass. argues that, even crediting the pleadings of both Bowers and Temple, the harms allegedly inflicted on Bowers by the two universities are not "the same," and thus that Temple's claim for contribution must fail. *See* U. Mass.'s Br. at 10–11. That is, whereas Temple has denied Bowers the opportunity to play football, and earn a scholarship, *at Temple,* U. Mass. has only denied Bowers a chance to play *for U. Mass. See id.* U. Mass. is surely correct that at least part of the harm from independent acts of discrimination can constitute distinct injuries. A child who seeks to enroll at, but is successively rejected by, a series of public schools, solely because of his or her race,

religion, or other irrelevant characteristic, plainly is stigmatized afresh by each rejection. Yet if the child's family is then obliged to pay for private schooling, each public school is also a "cause in fact" of the financial harm the family suffers as a result, since the harm would not have occurred but for the individual school's action. *See Keeton, supra,* § 41, at 265–67. Similarly, although Bowers alleges that he was harmed by the individual discrimination of each Defendant, he also alleges that he was harmed by his inability to receive an athletic scholarship. See 2d Am. Compl., Count I Requested Relief ¶ 4. Temple, in turn, alleges that Delaware State, Memphis, and U. Mass. recruited Bowers but elected not to offer him a scholarship as a result of his nonqualifer status. If the allegations in the Complaints of Bowers and Temple are true, as I must assume they are, then both Temple and the Third–Party Defendants share responsibility for Bowers's loss of an athletic scholarship. It would be unfair for Temple alone to bear the costs of that liability. Thus, I will deny U. Mass.'s Motion to Dismiss Temple's claims for contribution under Title II and the Rehab. Act.

### 4. Whether Memphis and Delaware State Would Have Been Immune from Suit by Bowers

As I have noted, a third-party plaintiff can only state a claim for contribution where the principal plaintiff himself could have brought a suit against the third-party defendants. Memphis and Delaware State argue that, as alter egos of their respective sovereign states, they would have been immune from suit by Bowers under either

Title II or the Rehab. Act. *See* Memphis's R. 12(b)(1) Br. at 3.[7] This argument presents me with a number of challenging and subtle legal questions, which I shall endeavor to resolve over the succeeding subsections. I first determine that the burden to demonstrate immunity lies with the moving party. I then consider whether Memphis, the only moving party to have come forward with evidence supporting its immune status, is in fact an arm of the State of Tennessee. Finding that it is, I confront the questions that have commanded the attention of many courts and scholars recently, the validity of Congress' clear abrogation of a state's Eleventh Amendment immunity to suit in federal court under Title II and under the Rehab. Act. Parting ways with my distinguished colleague, Judge Brown, I conclude that Congress has validly abrogated the States' Eleventh Amendment immunity under both Title II and the Rehab. Act. Thus, I will deny Memphis's motion.

### a. Allocation of Burdens in a Claim of Sovereign Immunity

In an ordinary Rule 12(b)(1) motion, the plaintiff bears the burden of persuading the court that subject matter jurisdiction exists. *See Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1409 (3d Cir.), *cert. denied,* 501 U.S. 1222, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991). Sovereign immunity is exceptional, however, in that while partaking of many of the features of jurisdiction, it remains an affirmative defense. *See Carter v. City of Philadelphia,* 181 F.3d 339, 347 (3d Cir.1999) (citing *Christy v. Pennsylvania Turnpike Com-*

---

7. Although Memphis's argument is, technically, a subpart of the overarching Rule 12(b)(6) motion, I accept the characterization of the sovereign immunity argument as falling under Rule 12(b)(1), albeit with some modifications that I must recognize. *See infra* Section III.B.4.a. It seems logical to employ here the same standards I would have applied had I been required to resolve the sovereign immunity question in the first instance, with Temple now standing in the shoes of Bowers.

*mission,* 54 F.3d 1140, 1144 (3d Cir.1995)). Thus, the burden is on Memphis and Delaware State to establish their immunity from suit. *Id.*

In a "factual" challenge to a court's jurisdiction, such as this, the court may consider material outside the pleadings. *See Gould Electronics, Inc. v. United States,* 220 F.3d 169, 176 (3d Cir.2000). If the defendant contests any allegations in the pleadings, by presenting evidence, the court must permit the plaintiff-or, in this case, the third-party plaintiff standing in the shoes of the plaintiff-to respond with evidence supporting jurisdiction. *Id.* (citing *Int'l Ass'n of Machinists & Aerospace Workers v. Northwest Airlines, Inc.,* 673 F.2d 700, 712–13 (3d Cir.1982)). The court may then determine jurisdiction by weighing the evidence presented by the parties. *Id.* However, if there is a dispute of a material fact, the court must conduct a plenary trial on the contested facts prior to making a jurisdictional determination. *Id.*

Delaware State has not come forward with any evidence demonstrating its relationship to the State of Delaware. I must therefore deny Delaware State's motion to dismiss Temple's claims for contribution under Title II and the Rehab. Act.[8]

#### b. Whether Memphis is an Arm of the State of Tennessee

■ The sovereign immunity of States guarantees that "nonconsenting States may not be sued by private individuals in federal court." *Bd. of Tr. of the Univ. of Alabama v. Garrett,* 531 U.S. 356, 121 S.Ct. 955, 962, 148 L.Ed.2d 866 (2001)

(citing *Kimel v. Fla. Bd. of Regents,* 528 U.S. 62, 73, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000)). The Supreme Court has recognized that the interests underlying the notion of sovereign immunity will sometimes require that entities not formally denominated as "the State" be attired in the State's immunity. *See Hess v. Port Auth. Trans–Hudson Corp.,* 513 U.S. 30, 41–48, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994) ("PATH"); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101–02, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) ("*Pennhurst II*"). Thus, where the state's treasury is at risk, or when responding to suit would undermine "the respect owed [States] as members of the federation," the Court has found that state-created entities stand in the place of the state itself, and must be accorded its immunity. *PATH,* 513 U.S. at 39–41, 115 S.Ct. 394. The Third Circuit has long employed a multi-factor balancing test to evaluate the strength of these paramount underlying concerns in claims of sovereign immunity by putative arms of the state. *See Fitchik v. New Jersey Transit Rail Operations, Inc.,* 873 F.2d 655 (3d Cir.1989); *Kovats v. Rutgers,* 822 F.2d 1303 (3d Cir.1987). Unfortunately, the unique facts of this case make the *Fitchik* test difficult to administer.

The first branch of the *Fitchik* test asks, logically enough, whether payment for a judgment against the defendant entity would come from the state fisc. *See Fitchik,* 873 F.2d at 659. The funding factor is the most important, *see id.* at 659–60, and, according to some readings of the *PATH* opinion, the only factor. *See PATH,* 513

8. U. Mass. has not joined Memphis' Rule 12(b)(1) motion, and does not appear to assert that it is an arm of the Commonwealth of Massachusetts. As I explain below, I will allow both U. Mass. and Delaware State to renew their motions and supplement their briefing to make clear whether or not they are

entitled to claim sovereign immunity. However, because I conclude that any such immunity has validly been abrogated or waived as to the federal claims, *see infra,* that determination is ultimately irrelevant to the motions with regard to the ADA and Rehab. Act.

U.S. at 55, 115 S.Ct. 394 (O'Connor, J., dissenting) ("[I]n place of the various factors ... for determining arm-of-the-state status, we may now substitute a single overriding criterion, vulnerability of the state treasury."). If the state is "in fact obligated" to pay a judgment against the entity, this factor will weigh very strongly in favor of immunity. *See id.* at 51, 115 S.Ct. 394.

As a result of a legal sleight of hand by the State of Tennessee, the source of Memphis's funding is uncertain. David Zettergren, the Assistant Vice President for Finance at Memphis, reports that in recent years, less than 50% of Memphis's budget has come from "State of TN appropriations." *See* Collier Cert. Exh. 4, ¶¶ 7–8. The remainder of the school's budget comes from sources such as tuition, gifts, parking fees, and the like. *See id.* I have previously determined that, where a majority of a university's funds come from non-state sources, and there is no other source of obligation to pay judgments, the first *Fitchik* factor does not support immunity. *See Bowers VI,* slip op. at 10–12. The sticking point is that Zettergren's implicit characterization of the tuition and other university-generated funds as *not* appropriated by the State of Tennessee is inconsistent with Tennessee law. The Tennessee legislature automatically takes to its own coffers all proceeds raised by its state universities, and re-appropriates those funds back to the university that raised them. *See* 2001 Tenn. Pub. Acts 435 § 29 it. 3; *Boyd v. Tennessee State Univ.,* 848 F.Supp. 111, 113 (M.D.Tenn. 1994) (citing *Greenhill v. Carpenter,* 718 S.W.2d 268, 271–72 (Tenn.Ct.App.1986)).[9] The State expressly provides that those

monies are "state funds" and are protected by the state's sovereign immunity. 2001 Tenn. Pub. Acts 435 § 29 it. 9. I describe this maneuver as a "sleight of hand" because it appears to be purely formal; there is no evidence in the Rule 12(b)(1) record to suggest that such funds would ever be used as truly general state revenues. Indeed, many gifts and grants to the university are for limited purposes, such that they could not legally be diverted. *See* Zettergren Aff. Exh. 2 at 145 (identifying university's receipt of over $25,000,000 in restricted funds annually).

This leaves me to determine whether the interests of sovereign immunity are truly served by recognizing a formalistic shuffling of state accounts plainly calculated to extend the state's immunity to an entity that might not otherwise receive it. Or, put another way, what is the significance of the fact that a money judgment would be enforceable against the State? Although the Supreme Court has explicitly rejected historicist accounts of the state treasury interest, *see Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 68–69, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), it has not provided a clear positive explanation.

Nonetheless, I believe one possible principle can be inferred from *PATH* and other, similar, cases. Both the majority and dissent in *PATH* discussed the centrality of the political accountability of the State to its status as a sovereign entitled to immunity from suit. *See PATH,* 513 U.S. at 42–43, 115 S.Ct. 394; *id.* at 58–62, 115 S.Ct. 394 (O'Connor, J., dissenting). The dissenters, however, claimed that the majority's undue focus on the source of money for damages gave the political accountability factor short shrift in the Court's

9. The Act states: "Item 3. All institutional revenues of any kind collected by the institutions in the course of their operations for their own use are hereby appropriated to the institutions in addition to the specific appropriations made by this act." 2001 Tenn. Pub. Acts 435 § 29.

overall analysis. *See id.* at 58, 115 S.Ct. 394 (O'Connor, J., dissenting). The dissent would have made political accountability, in the form of "real, immediate control and oversight" the guiding consideration. *Id.* at 62, 115 S.Ct. 394 (O'Connor, J., dissenting). In my view, this divergence in outcomes, despite what appears to be a shared interest in political accountability, can best be explained by a simple difference in the two sides' theories of accountability. The Court has suggested elsewhere that citizen suits can be a means for citizenry to monitor the behavior of their agents, the government, in much the same way that shareholder suits ensure the responsibility of corporate executives. *Cf. Lujan v. National Wildlife Federation,* 497 U.S. 871, 891, 894, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) (observing that, to the extent Congress has granted courts the power to entertain them, private lawsuits can be a mechanism for interest groups to affect the policy, and ensure the lawfulness, of agency action). The *PATH* majority expands that view, suggesting that accountability *only* exists where there is liability for damages. The approach of the dissenters is roughly opposite; for them, damages liability is largely incompatible with the public's ability, through its legislature, to "set its own agenda." *PATH,* 513 U.S. at 60–61, 115 S.Ct. 394 (O'Connor, J., dissenting).

Soon after *PATH,* however, the Court seems to have realized that its own precedents held the key to resolving its internal disagreement. In *Regents of the Univ. of California v. Doe,* a unanimous Court held that the "State's legal liability for suit" is in fact only "an indicator of the relationship between the State and its creation." 519 U.S. 425, 430–31, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997). Thus, even though California did not itself pay judgments, the fact that it was theoretically exposed to the University of California's liability was sufficient to confer the state's immunity on the university. *See id.* I read *Doe* as a sort of rapprochement between the two sides in *PATH. Doe* is an acknowledgment by the *PATH* majority that the opening of the state fisc can merely provide evidence, albeit near-irrebutable evidence, of the state's choice in ordering its government, and perhaps an acknowledgment by the *PATH* dissent that liability may itself be a form of political accountability. More importantly, though, by emphasizing "the nature of the entity created by state law," the Court displays its intention to defer to each individual state's determination of the best account of political accountability. *Doe,* 519 U.S. at 429, 117 S.Ct. 900 (citing *Mt. Healthy City Bd. of Educ. v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). In doing so, the Court also restored consistency between its sovereign immunity jurisprudence and its more generally-held view that states are entitled to considerable latitude in designing their own brand of republican government.[10] *See Gregory v. Ashcroft,* 501 U.S. 452, 460–63, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) (citing *Sugarman v. Dougall,* 413 U.S. 634, 647–48, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973)); *Dunn v. Blumstein,* 405 U.S. 330, 344, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); *cf. Louisiana v. Jumel,* 107 U.S. 711, 727, 2 S.Ct. 128, 27 L.Ed. 448 (1883) ("[T]he political power cannot be thus ousted of its jurisdiction, and the judiciary set in its place.")

With these principles in mind, I turn back to the question of Memphis's fund-

10. It might be argued that it is at least odd to vest in states the power to arrange for the responsibility of their entities and officers to federal obligations. This concern is met, I think, by the power of Congress to abrogate sovereign immunity under section five of the Fourteenth Amendment, as well as by the individual liability of officers to suit.

ing. Under the view of *Doe* I have just outlined, a state that immunizes one of its creations from suits is, in effect, determining that it prefers a model of accountability that flows exclusively through the electoral process. Thus, the label of "state funds" attached to all of Memphis's revenues is not *empty* formalism-it is formalism evincing a particular account of republican government in the State of Tennessee. Under Supreme Court precedent as I understand it, I am bound to accept that account.. As a result, I must conclude that any judgment against Memphis would come from state funds. *Cf. Jain v. Univ. of Tenn. at Martin*, 670 F.Supp. 1388, 1390 (W.D.Tenn.1987) (relying on Tennessee legislature's declaration that it had not waived its sovereign immunity for suits against the University of Tennessee), *aff'd*, 843 F.2d 1391 (6th Cir. 1988).

All nine members of the Supreme Court have agreed that "the vulnerability of the state treasury" is "a sufficient condition for Eleventh Amendment immunity." *PATH*, 513 U.S. at 59, 115 S.Ct. 394 (O'Connor, J., dissenting); *see id.* at 50–51, 115 S.Ct. 394. Thus, I need not consider the remaining *Fitchik* factors.[11] I find that Memphis is an arm of the State of Tennessee, and entitled to the state's sovereign immunity.

**c. Whether Congress Validly Abrogated Tennessee's Eleventh Amendment Immunity in the Enactment of Title II**

 Congress is not entirely dependent upon the States' ordering of the lines of accountability for state instruments. Where Congress "unequivocally intends" to abrogate the sovereign immunity of a state, and that abrogation lies within " 'a valid grant of constitutional authority,' " Congress may render a state susceptible to suit. *Garrett*, 121 S.Ct. at 962 (quoting *Kimel*, 528 U.S. at 73, 120 S.Ct. 631). Congress' Article I powers are not a "valid" source of authority for abrogation. *See id.* (citing *Kimel*, 528 U.S. at 79, 120 S.Ct. 631; *Seminole Tribe*, 517 U.S. at 72–73, 116 S.Ct. 1114). On the other hand, the enforcement provisions of § 5 of the Fourteenth Amendment (" § 5"), and the parallel enforcement provisions of the other Civil War Amendments, *are* valid sources of abrogational authority. *See id.* (citing *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976)); *South Carolina v. Katzenbach*, 383 U.S. 301, 308, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966). In addition, Congress may allow private parties to compel state compliance with federal law through the vehicle of suits for prospective injunctive relief against state officers in their official capacities. *See Edelman v. Jordan*, 415 U.S. 651, 664–68, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (citing *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)). This power is subject only to the ordinary limits on Congress' power to, for instance, regulate commerce. *Cf. id.* (allowing suit against state officer under Commerce Clause legislation); *New York v. United States*, 505 U.S. 144, 160–61, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) (noting that Commerce power allows regulation of States as commercial actors); *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 554–55, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985) (same).

i.

Although the procedure for evaluating the validity of a congressional abrogation

---

**11.** The remaining *Fitchik* factors, of course, are still relevant where the state funding factor is not determinative.

of Eleventh Amendment immunity is "now familiar," my understanding of that procedure appears to differ somewhat from those of the other courts to have considered the constitutionality of Title II.[12] In order to determine whether Congress has acted pursuant to a valid grant of constitutional authority, my "first step" must be to "identify with some precision the scope of the constitutional right at issue." *Garrett*, 121 S.Ct. at 963. I must then determine whether Congress intended only to enforce that right, as is its prerogative, or whether it instead improperly sought to redefine the underlying substantive provision of the Fourteenth Amendment. *See Fla. Prepaid Postsecondary Educ. Expense Bd. v. College Savings Bank*, 527 U.S. 627, 638–39, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999) (citing *City of Boerne v. Flores*, 521 U.S. 507, 518–20, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997)). In making that determination, I must first compare the scope of conduct targeted by Congress' ostensible exercise of the § 5 power with the extent of conduct that Article III courts have

recognized as unconstitutional.[13] *See Kimel*, 528 U.S. at 83, 120 S.Ct. 631. Even if Congress has sought to punish conduct that would be approved by courts, its enactments may still be upheld as "prophylactic" if the legislative record demonstrates a "congruence and proportionality" between the legislation and the commission of actual constitutional violations by states. *Id.* at 81, 120 S.Ct. 631 (citing *Boerne*, 521 U.S. at 519–20, 531–32, 117 S.Ct. 2157).[14] Notably, the Court no longer prefaces its examination of the legislative record, which in recent cases seems to have been quite close and careful, with an avowal of deference to Congress' findings. *Compare Garrett*, 121 S.Ct. at 964–65, *with Katzenbach*, 384 U.S. at 651, 86 S.Ct. 1717.

It is in the process of comparing the actual constitutional right with the putative remedies created by Congress that my approach differs from other federal courts. In assessing whether Title II represents an improper redefinition of the meaning of the Equal Protection Clause, many courts

---

12. The parties do not dispute that Congress unequivocally intended to abrogate the sovereign immunity of the states under the ADA. *See* 42 U.S.C. § 12202 (2000); *Garrett*, 121 S.Ct. at 962.

13. Some commentators have argued that the true outer bounds of a constitutional prohibition may extend beyond that which the Court, in its limited institutional competence, has permitted itself to recognize. *See, e.g.,* Robert C. Post and Reva B. Siegel, *Equal Protection by Law: Federal Antidiscrimination Legislation After* Morrison *and* Kimel, 110 Yale L.J. 441, 467–69 (2000). In other words, a constitutional tree may fall, even when federal courts are not there to hear it. While it is ultimately for the Supreme Court to defend its own doctrine, I note that suits brought by individuals, inviting federal courts to recognize violations of the Constitution beyond what federal courts have thought it prudent to identify, and demanding recompense for them, may similarly strain the competence of federal courts.

14. I note that the Supreme Court's opinion in *Garrett* appears to proceed immediately to an evaluation of the legislative record. *See Garrett*, 121 S.Ct. at 964 ("Once we have determined the metes and bounds of the constitutional right in question, we examine whether Congress identified a history and pattern of unconstitutional employment discrimination by the States against the disabled."). However, in the course of that evaluation, the Court does conduct the requisite comparison between unconstitutional conduct and the conduct targeted by Congress. *See id.* at 966–67. The happenstance of the Court's organization should not be read as imposing-*sub rosa*, as it were-a requirement of legislative documentation even for conduct that the Court itself would recognize as unconstitutional. Indeed, the Court notes elsewhere that " § 5 legislation *reaching beyond the scope of § 1's actual guarantees* must exhibit 'congruence and proportionality....' " *Id.* at 963 (quoting *Boerne*, 521 U.S. at 520, 117 S.Ct. 2157) (emphasis added).

seem to have presumed that Congress' invocation of § 5, among other sources of potential authority, *see* 42 U.S.C. § 12101(b)(4) (2000), must mean that *every* provision of Title II is enacted pursuant to § 5. *See, e.g., Alsbrook v. City of Maumelle,* 184 F.3d 999, 1008–10 (8th Cir.1999) (en banc), *cert. dismissed,* 529 U.S. 1001, 120 S.Ct. 1265, 146 L.Ed.2d 215 (2000). Yet that view may give far too little weight to the notion that "[b]ecause such legislation imposes congressional policy on a State involuntarily, and because it often intrudes on traditional state authority, we should not quickly attribute to Congress an unstated intent to act under its authority to enforce the Fourteenth Amendment." *Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1, 16, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). Moreover, to the extent that Title II is ambiguous, the prevailing approach among the lower courts might also be a rush to constitutional judgment of a statute that could, and therefore should, instead be interpreted not to present any constitutional difficulty. *See Public Citizen v. United States Dep't of Justice,* 491 U.S. 440, 465–66, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989) (citing *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988); *Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932)); *Webster v. Doe,* 486 U.S. 592, 603, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988); cf. *Spector Motor Serv., Inc. v. McLaughlin,* 323 U.S. 101, 105, 65 S.Ct. 152, 89 L.Ed. 101 (1944) ("[W]e ought not to pass on questions of constitutionality ... unless such adjudication is unavoidable.").

Suppose, for instance, that Congress were to enact an anti-discrimination statute in which it clearly invoked its § 5 power to award damages only where a court would find that the Constitution had been violated, and invoked its Commerce Clause power to provide for prospective injunctive relief against state officers in all other instances of state discrimination.[15] Such a statute does not redefine any substantive Fourteenth Amendment rights; it merely adopts the rights created by the courts, and, additionally, sets some standards for the behavior of commercial actors under its Article I power. The Article III power is preserved as the exclusive domain of the federal courts, as the "appropriate legislation" test requires. *See Kimel,* 528 U.S. at 81, 120 S.Ct. 631; *Boerne,* 521 U.S. at 536, 117 S.Ct. 2157. It appears that Congress has not yet learned to write statutes quite so clearly. Where a statutory scheme is reasonably open to a similar interpretation, however, and in light of the two important principles of statutory interpretation to which I have just alluded, I must presume that Congress intended to exercise its § 5 power no more than necessary, nor in such a way as to raise a serious question as to the constitutionality of that usage. Assuming that the language of a statute is flexible enough

---

15. For example:

**The Discrimination in Widget Production Act of 2001**

**Section 101.** It shall be unlawful for all producers of widgets, including states, to discriminate in hiring.

**Section 102.** Where any discrimination covered by section 101 would be found by a court to violate the Fourteenth Amendment, Congress hereby exercises its authority under § 5 of that Amendment to make damages remedies available against the violator. It is Congress' intent that this section shall abrogate the sovereign immunity of any state violator.

**Section 103.** In any instance of discrimination not covered by section 102, Congress hereby exercises its power under the Commerce Clause to make available prospective injunctive relief against the violator, or, where the violator is protected by sovereign immunity, against its officers.

to allow both interpretations, the most appropriate formulation of the second *Florida Prepaid/Boerne* question, then, is not "to what extent did Congress seek to regulate constitutional conduct?" but rather "to what extent did Congress seek to regulate constitutional conduct in a way it could not have under the Commerce Clause (or any other provision other than the Fourteenth Amendment)?"

### ii.

■ Having established the proper standard, I now turn to whether Title II does, in fact, validly abrogate Tennessee's sovereign immunity. The first part of that task, the scope of the underlying constitutional violation, is not difficult, since the *Garrett* Court was itself examining Title I of the ADA. See *Garrett*, 121 S.Ct. at 963. The Court concluded that the disabled are not a suspect class, such that legislation affecting them is subject only to "rational-basis review." *Id.* (citing *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 441, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)). As a result, "States are not required by the Fourteenth Amendment to make special accommodations for the disabled, so long as their actions toward such individuals are rational." *Id.* at 964. On the other hand, intentional discrimination, unalloyed with any legitimate policy, fails even rational-basis scrutiny. See *Romer v. Evans*, 517 U.S. 620, 631–32, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996); *Garcia*, 2001 WL 1159970, at *8.

It is ambiguous whether Title II employs Congress' § 5 power to regulate conduct beyond that proscribed in *Garrett, Cleburne,* and *Romer.* The legislative history of the ADA is equivocal on the availability of damages for unintentional discrimination. The House report states, "As with Section 504, there is also a private right of action for persons with disabilities, which includes the full panoply of remedies." H.R.Rep. No. 101–485(II), *reprinted in* 1990 U.S.C.C.A.N. 303, 381. That statement does not provide much evidence either way. Similarly, while the Conference Committee report observes that "[t]he Rehabilitation Act provides a private right of action, with a full panoply of remedies available," *id.* No. 101–485(III), *reprinted in* 1990 U.S.C.C.A.N. 445, 475, the case the Committee cites for that proposition expressly reserved the question whether damages were available where there was no intentional discrimination. See *Miener v. State of Missouri*, 673 F.2d 969, 979 (8th Cir.1982). In its testimony, the first Bush administration took the position that no damages were available under Title II at all. See H.R. Doc. No. 101–58, at 189, 195 (1989) (statement of Attorney General Thornburgh).

However, I have previously determined that compensatory damages are only available under Title II under a theory of intentional discrimination. See *Bowers V*, slip op. at 7–8. I rested my determination on the fact that Title II incorporates the remedies of the Rehab. Act, which in turn incorporates Title VI.[16] *Id.* Because I then

---

**16.** The Third Circuit has found that compensatory damages are available under both the Rehab. Act and Title II. See *Jeremy H. by Hunter v. Mount Lebanon Sch. Dist.*, 95 F.3d 272, 278–79 (3d Cir.1996) (citing *W.B. v. Matula*, 67 F.3d 484, 492–493 (3d Cir.1995)). While the *Hunter* and *Matula* opinions are unclear about whether they are limited to instances of intentional discrimination, *Matula* appears to rely on an earlier Supreme

Court opinion construing Title IX. See *Matula*, 67 F.3d at 494. In that opinion, the Supreme Court implied rather strongly that claims for damages under the Rehab. Act are only available for intentional discrimination. See *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 74–75, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992). While I believe that *Matula*'s reference to *Gwinnett* could plausibly support a conclusion that the Third Circuit

believed, as the Supreme Court has since confirmed, that "*Guardians* held that private individuals could not recover compensatory damages under Title VI except for intentional discrimination," *Sandoval*, 121 S.Ct. at 1517–18, I concluded that the Rehab. Act, too, provides for compensatory damages only in instances of intentional discrimination. *See Bowers III*, 118 F.Supp.2d at 504–07.

The mere fact that damages under Title II are probably limited to instances of intentional discrimination does not necessarily guarantee that Title II will exact payment only from irrational state defendants. Intentional discrimination is never rational; it is based on fear and ignorance, the very opposite of rationality. *See Romer*, 517 U.S. at 632–33, 116 S.Ct. 1620. The Court has noted, however, that rational bases for a decision may sometimes "accompany" these illegitimate factors, thereby rendering the decision constitutional. *See Garrett*, 121 S.Ct. at 964. Thus, if Title II were to permit damages in instances where the motives of the state defendant were mixed in this way, it would be exceeding the ambit of the Court's Fourteenth Amendment jurisprudence.

I see nothing in the text of the ADA that clearly resolves the mixed motive question. However, at the time both the ADA and Rehab. Act were enacted, the Supreme Court was already employing the now-familiar burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) to identify triable instances of intentional discrimination. *McDonnell Douglas* permits the dismissal of claims where the defendant has an unrebutted, legitimate non-discriminatory purpose for its actions. *See id.* While this screening may be im-

perfect, instances where a state would pay damages when it had mixed motives for acting should be rather rare. I think it at least plausible that Congress fully anticipated at the time of the Rehab. Act and Title II that courts would apply *McDonnell Douglas* to claims under those provisions. If so, that is strong evidence for the proposition that Congress did not intend to allow damages in the case of mixed-motive defendants.

On the whole, then, there is a reasonable reading of Title II in which Congress' § 5 power need only be exercised to penalize unconstitutional conduct. While it is certainly true, as other courts have observed, that Title II regulates a wide variety of conduct that could be characterized as rational, *see, e.g., Doe v. Division of Youth and Family Services*, 148 F.Supp.2d 462, 488–89 (D.N.J.2001) (Brown, J.), the best reading of the statute suggests that the only remedy for disparate impact violations is an injunction. As I have noted, Congress may appropriately subject state officers to prospective injunctive relief pursuant to its Commerce Clause power. *See Edelman*, 415 U.S. at 664–68, 94 S.Ct. 1347. Congress plainly considered the ADA generally, and Title II in particular, to be a very significant piece of commercial legislation. *See* 42 U.S.C. § 12101(a)(9) (noting that "dependency and nonproductivity" resulting from discrimination against the disabled costs the United States "billions of dollars"); *id.* § 12101(b)(4) (invoking congressional authority to regulate commerce). The legislative history evinces a continuing focus on the economic impact of the public accommodations aspects of the bill. Congress noted, for instance, that lack of accommodations creates unemployment and under-

does not permit damages under the Rehab. Act for unintentional discrimination, I have previously concluded that the question is

probably still open. *See Bowers III*, 118 F.Supp.2d at 504.

employment, *see* H.R. Rep. 101–485(II), *reprinted in* 1990 U.S.C.C.A.N. 303, 310, 367; H.R. Rep. 101–485(IV), *reprinted in* 1990 U.S.C.C.A.N. 512, 514, reduces consumer spending, *see* H.R. Rep. 101–485(II), *reprinted in* 1990 U.S.C.C.A.N. 303, 316–17, and undermines public health efforts to contain the spread of disease, *see id.* at 313, all of which contribute to lower tax revenues and higher government spending, amounting to "billions of dollars annually." *Id.* at 325–29 (statement of Pres. Bush). Lastly, it appears there are no more than three justices on the present Supreme Court who believe that those portions of the ADA that do not intrude on a state's sovereign immunity exceed Congress' Article I powers. *See Garrett,* 121 S.Ct. at 968 (Kennedy, J., concurring); *id.* at 975–76 (Breyer, J., dissenting).

In contrast, the statutory schemes found unconstitutional by the Supreme Court in *Florida Prepaid, Kimel,* and *Garrett* offered no reasonable interpretation that would not have permitted damages for constitutional conduct by states in at least some instances. Indeed, in *Florida Prepaid,* the Court was quite explicit that the two most glaring flaws of the Patent Remedy Act were that "Congress did nothing to limit the coverage of the Act to cases involving arguable constitutional violations ... [n]or did it make any attempt to confine the reach of the Act by limiting the remedy to certain types of infringement." *Fla. Prepaid,* 527 U.S. at 646–47, 119 S.Ct. 2199. In *Kimel,* the Court determined that, notwithstanding some possible exceptions, the language of the statute led to the inescapable conclusion that the Act there permitted for either "legal or equitable relief" against states for "substantially more state employment decisions and practices than would likely be held unconstitutional." *Kimel,* 528 U.S. at 67, 87–88, 120 S.Ct. 631. Finally, the ADA Title I remedies in *Garrett* cross-reference the

remedies available under Title VII of the Civil Rights Act of 1964. *See* 42 U.S.C. § 12117(a) (2000). It is undisputable that Title VII permits retroactive relief in private disparate impact suits. *See Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 364–66, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 422–23, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). Thus, Title I of the ADA was not susceptible to any interpretation that would have avoided the need for Congress' § 5 power.

I conclude, therefore, that Title II does not invoke Congress' § 5 power against conduct the courts would not themselves recognize as unconstitutional. I am reluctant, as I must be, to infer that Congress has played that ultimate trump card in its relations with the States. I must similarly be hesitant to read Title II to create a serious question of constitutionality. Clearly, there is at least one possible reading of Title II in which Congress unconstitutionally exceeded its power. *See Thompson v. Colorado,* 258 F.3d 1241, 1251–55 (10th Cir.2001); *Alsbrook,* 184 F.3d at 1012; *Popovich v. Cuyahoga County Court of Common Pleas,* 227 F.3d 627, 637–42 (6th Cir.2000), *vacated, reh'g en banc granted,* 227 F.3d 627 (6th Cir. 2000). That reading is not the only possible reading, however, nor is it the best, even under ordinary principles of statutory interpretation.

Thus, I read Title II to call upon Congress' § 5 power only insofar as it makes available damages for intentional discrimination. In all other respects, Title II is simply regulation under the Commerce Clause. Since this arrangement falls within the scope of the Fourteenth Amendment already recognized by Article III courts, it is "appropriate legislation." *Fla. Prepaid,* 527 U.S. at 637, 641–47, 119 S.Ct. 2199; *see Garrett,* 121 S.Ct. at 963; *Kimel,* 528

U.S. at 82–88, 120 S.Ct. 631. Congress has abrogated Tennessee's sovereign immunity under Title II. As a result, I must deny Memphis's Motion to Dismiss Temple's claim for contribution under Title II.

### d. Whether the State of Tennessee Has Waived its Eleventh Amendment Immunity from Suit Under the Rehab. Act

When a state receives federal dollars, it does so subject to any non-coercive condition Congress has expressly attached to the receipt of its funds. *See South Dakota v. Dole,* 483 U.S. 203, 207, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987). The United States has clearly made the grant of any federal funds contingent on waiver of a recipient state's sovereign immunity from suit under Section 504 of the Rehab. Act. *See* 42 U.S.C. § 2000d–7 (2000); *Garcia,* 2001 WL 1159970, at *10, —— F.3d at ——; *Jim C. v. United States,* 235 F.3d 1079, 1082 (8th Cir.2000) (en banc). The principles of *Dole* apply to waivers of sovereign immunity, at least in the case of knowing, uncoerced waiver. *See College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 680–81, 686–87, 119 S.Ct. 2219, 2228–2229, 2231, 144 L.Ed.2d 605 (1999).

Tennessee has knowingly waived its sovereign immunity. While this would seem obvious from the face of the Rehab. Act, it might be argued that, given the fact that Title II duplicates the effects of the Rehab. Act, and that Title II abrogates, or might have been thought to abrogate, a state's sovereign immunity, a state might not have believed it was surrendering anything meaningful in agreeing to a waiver. *See Garcia,* 2001 WL 1159970, at *11, —— F.3d ——. I find this argument unpersuasive. When attorneys draft pleadings with overlapping claims, or, in their briefs, make arguments in the alternative, I do not suppose they do so to waste my time and their own. The law is uncertain and subject to change, and prudent counsel prepare for the unexpected. As it well knew, by surrendering its immunity as a condition of receiving federal funds, Tennessee gave up a significant measure of insurance against alterations in the law of sovereign immunity.

On the record before me, I also must conclude that Tennessee's waiver was not coerced. Memphis argues that the "financial inducements" employed by Congress can become so "coercive as to cross the point where pressure turns into compulsion." *College Savings,* 527 U.S. at 687, 119 S.Ct. 2219 (quoting *Dole,* 483 U.S. at 211, 107 S.Ct. 2793) (internal quotation marks omitted). Memphis argues that giving up direct federal grants, as well as federal grants and subsidies awarded to attending students, would be so burdensome that it is effectively compelled to accept. *See* Memphis's R. 12(b)(1) Br. at 37–38. While I need not decide the precise level of subsidy that would constitute coercion, I note that the Eighth Circuit has opined that Arkansas was not coerced into waiving its sovereign immunity despite the potential loss of about $250 million, or approximately one-eighth of its annual state education budget. *See Jim C.,* 235 F.3d at 1082. Memphis, however, has offered very little evidence of the extent of its dependence on federal aid. The University of Memphis budget indicates that less than one percent of its unrestricted funds comes from "federal grants and contracts." *See* Collier Cert. Exh. 4. The Tennessee State Budget reveals that, of a total of nearly two billion dollars spent on higher education in 1999–2000, *see* Collier Aff. Exh. 1 at B–138, about $76 million came directly from federal sources, *see id.,* with an additional $38 million in federally subsidized loans contributing to the payment of tuition and fees, *see id.* at B–117,

for a grand total of about .5% of the state higher-education budget. Whatever may be the upper limit of non-coercive contributions, one percent, or one half of one percent, does not approach it.

Finally, Memphis argues that it, or the Tennessee Board of Regents acting on its behalf, lacked the authority to waive Tennessee's sovereign immunity. *See* Memphis's R. 12(b)(1) Br. at 36. By this argument, however, Memphis and the Tennessee Board of Regents also lack the power to enter into a contract that would result in waiver. In effect, Memphis is arguing that it lacks the authority to receive federal funds. Since the Tennessee legislature seems not to have bestirred itself to prevent Memphis from receiving these illicit federal funds, I deem it inappropriate to intervene on the legislature's behalf.

Finding that Tennessee's waiver of its sovereign immunity pursuant to the Rehab. Act was knowing and voluntary, I must deny Memphis's Motion to Dismiss Temple's claim for contribution under the Rehab. Act.

### C. Whether Temple May Assert Claims for Contribution Under the New Jersey Law Against Discrimination

■ Before addressing the merits of Temple's claims for contribution under the NJLAD, I must first be certain that I have jurisdiction even to entertain such claims. A state's sovereign immunity shields it from supplemental state law claims brought against it in federal court, absent its consent. *See Pennhurst II,* 465 U.S. at 106, 104 S.Ct. 900; *Rudolph v. Adamar of New Jersey,* 153 F.Supp.2d 528, 540–41 (D.N.J.2001); *Bowers V,* slip op. at 16. Therefore, my finding that Memphis is an arm of the State of Tennessee, *see supra* Section III.B.4.b., necessarily bars Tem-

ple's contribution claim under the NJLAD. At present, I do not have sufficient information to determine whether or not U. Mass. and Delaware State are entitled to claim the sovereign immunity of their respective states. As I have done previously in this litigation, I shall provide both U. Mass. and Delaware State thirty days from the date of this Opinion and Order to provide supplemental briefing on their relationship to their parent states. Temple, if it wishes, may have ten days thereafter in which to reply. At that time, I will rule on U. Mass. and Delaware State's motions to dismiss the NJLAD counts.

### IV. CONCLUSION

For the reasons set forth above, I shall deny the Third–Party Defendants' Motions to Dismiss Temple's claims for contribution under the ADA and Rehab. Act. However, I shall also grant Memphis's Motion to Dismiss the NJLAD claim. The motions by U.Mass. and Delaware State to dismiss Temple's NJLAD claim shall be denied without prejudice to the rights of the parties to renew their motion and submit supplemental briefing on the movants' status as arms of their respective states. The Court will enter an appropriate form of order.

### ORDER

This matter having come before the Court on the motions of the University of Memphis and Delaware State University to dismiss, pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6), and the University of Massachusetts Amherst's Motion to Dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), Peter L. Frattarelli, Esq. Archer & Greiner, PC, appearing on behalf of Third–Party Defendant, University of Memphis, Michael K. Willison, Esq., Dickie, McCamey & Chilcote, appearing on behalf of Third–Party Defendant, Delaware State University, Linda B. Celauro, Esq., John James Peirano, Jr., Esq., Carpenter,

Bennett & Morrissey, appearing on behalf of Third–Party Defendant, University of Massachusetts Amherst, and John B. Langel, Esq., Abigail L. Flitter, Esq., Ballard Spahr Andrews & Ingersoll, LLP, appearing on behalf of Defendant and Third–Party Plaintiff, Temple University of the Commonwealth System of Higher Education; and,

The Court having considered the papers submitted by counsel for Third–Party Defendants, University of Memphis, Delaware State University, and University of Massachusetts Amherst, in support of the motion and the papers submitted by counsel for Third–Party Plaintiff, Temple University of the Commonwealth System of Higher Education in opposition;

For the reasons set forth in the Opinion issued herewith, IT IS, on this seventh day of November, 2001, hereby ORDERED that:

1. Third–Party Defendant, University of Memphis's motions are GRANTED in part and DENIED in part; and,

2. The motions of Third–Party Defendants, Delaware State University and University of Massachusetts Amherst are DENIED; and,

3. The motions of Third–Party Defendants, University of Memphis, Delaware State University and University of Massachusetts Amherst, to dismiss the claims for contribution by Third–Party Plaintiff, Temple University of the Commonwealth System of Higher Education, pursuant to the Americans with Disabilities Act and the Rehabilitation Act, are DENIED WITH PREJUDICE; and,

4. The motion of Third–Party Defendant, University of Memphis, to dismiss the claim for contribution by Third–Party Plaintiff, Temple University of the Commonwealth System of Higher Education, under the New Jersey Law Against Discrimination, is GRANTED; and,

5. The motions of Third–Party Defendants, Delaware State University and University of Massachusetts Amherst, to dismiss the claim for contribution by Third–Party Plaintiff, Temple University of the Commonwealth System of Higher Education, under the New Jersey Law Against Discrimination, are DENIED WITHOUT PREJUDICE to the rights of Third–Party Defendants, Delaware State University and University of Massachusetts Amherst, to renew their motion upon submission of supplemental briefing; and,

6. Third–Party Defendants, Delaware State University and University of Massachusetts Amherst shall submit any supplemental briefing on claims under the New Jersey Law Against Discrimination within thirty days of the date of this Order; and,

7. Third–Party Plaintiff, Temple University of the Commonwealth System of Higher Education, shall have ten days thereafter in which to respond to any supplemental briefing by the Third–Party Defendants, Delaware State University and University of Massachusetts Amherst.